FIFTH DIVISION

No. 1-05-2805

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 20224 |
| | ) | |
| MIGUEL FIGUEROA, | ) | The Honorable |
| | ) | Fred G. Suria, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Following a jury trial, defendant Miguel Figueroa was convicted of two counts of first degree murder (felony murder and knowing and intentional murder) and sentenced to 45 years in prison. He appeals, contending that: (1) his conviction for felony murder and his conviction for knowing and intentional murder were both erroneous; (2) the trial court erred in barring evidence of the character of two people in support of his claim of self-defense; and (3) the State's rebuttal closing argument was improper in several aspects, causing him substantial prejudice. Defendant asks that we vacate and/or reverse his convictions and remand for a new trial. For the following reasons, we affirm.

BACKGROUND

The following evidence was established during trial.

At approximately 6 p.m. on July 19, 2000, shortly after playing baseball with his younger brother, 12-year-old Miguel De La Rosa was shot in the chest by a stray bullet from a .380

semiautomatic gun and was killed while on the street in the Humbolt Park area of Chicago.

Nick Labellarte testified that on that date, he, Lonnie Gambill and defendant, all members of the Spanish Cobras street gang, were at defendant's grandmother's house for a barbeque. At about 6 p.m., Labellarte and defendant, whose nickname is Mousey, left the barbeque and walked down the street toward an area controlled by the rival Latin Kings street gang. As they approached, they saw Charles Ellison, a member of the Latin Kings, standing on his porch with his girlfriend. Labellarte testified that defendant and Ellison exchanged words and both threw down the other's gang sign, a form of disrespect. Labellarte and defendant then began walking back toward defendant's grandmother's house, where they met Gambill on the street. Another member of their gang, Manuel Coronado, pulled up to the group soon after in his beige Bonneville car. Labellarte, Gambill and defendant got into Coronado's car so they could go smoke some marijuana.

Labellarte further testified that when they got in the car, they saw Ellison in his car, a black Delta. Labellarte stated that as they began to drive away, Ellison saw them and started chasing them in his car, and then a beige van joined the chase. The van was driven by Wilson Torres, a member of Ellison's gang. Labellarte testified that as the chase continued through the surrounding neighborhoods, he saw defendant, who was in the front passenger seat of Coronado's car, stand up through the car's sunroof and shoot a gun at Ellison's car and the van behind them. Labellarte stated that while he did not know at the time that defendant had a gun, he immediately recognized it as the .380 semiautomatic that belonged to their gang. He further stated that defendant fired the gun four times, that neither he (Labellarte) nor anyone else in Coronado's car

2

encouraged defendant to do so, that he never heard any shots fired at them from Ellison's car or Torres' van, and that he was scared during the chase.

Coronado testified that he was driving his Bonneville after work when he saw defendant, Gambill and Labellarte on the street. They all decided to get into Coronado's car to go smoke some marijuana together. Coronado, who entered the Marines shortly after this incident and was a sergeant at time of trial, stated that as soon as they all got into his car and started driving away, they were chased by a Delta and a van. He averred that he saw people in the Delta and the van displaying Latin King gang signs, but that no one in his car responded. Coronado noted that there was a police station nearby, but he did not drive to it. He further testified that suddenly, without any encouragement from anyone in his car, defendant pulled out a gun, stood up through the sunroof of the car, and began shooting at the Delta and the van. Coronado stated that he did not know defendant was armed or that he was going to shoot at anyone; immediately after defendant shot the gun, Coronado asked him "what the f-ck" he thought he was doing. Coronado further stated that while he was scared during the chase, he was always certain he could outmaneuver Ellison and Torres during the chase to get away.

Prior to the testimony of Charles Ellison, the parties discussed with the court defendant's desire, in support of his affirmative defense of self-defense, to examine Ellison regarding two prior crimes for which Ellison was charged: a murder case in which he was found not guilty and another murder case which was dismissed before trial. Defendant argued that he was not introducing this evidence to impeach Ellison but rather to "explain [his own] fear and explain why he acted the way he did." The court disagreed, stating that if defendant took the stand, he

3

could testify regarding his state of mind, and if that occurred, then he could recall Ellison.

Accordingly, Ellison testified that he was standing on a porch with his girlfriend when he saw defendant and Labellarte approaching his parked Delta and throwing gang signs. Ellison and defendant exchanged words, but Ellison pointed out there were children in the area including his own and thus went inside the house. Ellison also let his pit bull loose in his yard, at which point defendant and Labellarte left the area. Ellison stated that he then got in his Delta and his friend Torres pulled up in his beige van, and they started driving. Soon after, a beige Bonneville pulled up next to them with its occupants disrespecting the Latin Kings gang sign, and a chase ensued. Ellison further stated that at one point, he believed someone in the Bonneville threw a bottle at his car; he pulled over for a moment, and the van took the lead in chasing the Bonneville. He then saw defendant pop up through the sunroof and heard gunshots. Ellison did not see defendant fire a weapon, as the van was in front of his Delta blocking his view at times. Ellison stated that there were no weapons in his car or in the van and he never mentioned having any weapons to defendant at any time that day.

Following Ellison's testimony, defendant sought to make an offer of proof, again in support of his theory of self-defense, to show that Ellison and Torres had reputations for violence and, thus, were the initial aggressors in this incident. The court again stated that defendant could "bring out all of the incidences of violence" he wished "if [defendant] takes the stand and tells what was in his frame of mind." However, the court allowed defendant to make his offer of proof outside the presence of the jury for the record. Christine Crandall, who worked for the local Community Alternative Policing Strategy (CAPS) program, testified that on June 22, 2001,

4

she was getting into a car when Torres and another man approached her. Crandall stated that Torres told her she needed to "stop calling the police or else." Elizabeth Candelaria testified that on June 12, 2001, she confronted Torres and another young man as they were trying to open a fire hydrant. Candelaria stated that Torres told the other man to hit her with the tool they were using, and that Torres later laughed at her and showed her a gun, telling her it was for her and that he was going to kill her.

Several other witnesses testified at trial. Elizabeth Kirkland testified that she was outside with a group of friends on the street when she saw a car carrying Coronado, Labellarte, Gambill and defendant (all of whom she knew) coming down the street and throwing rival Latin King gang signs. She saw defendant with a gun. Kirkland stated that Coronado's car stopped and defendant exchanged words with Ellison; she did not see anyone in Ellison's car or the van throw any gang signs or display any weapons. Ellison's car and the van chased Coronado's car, and when they turned a corner, Kirkland heard gunshots.

Angel Lopez, the victim's younger brother and 11 years old at the time of the incident, testified that he and Miguel were playing baseball outside when he saw a beige car speed down the street with a Hispanic man standing up through the sunroof holding a pistol. The man started shooting at a beige van and a black car that were following. Angel stated that he then saw his brother fall to the ground with blood coming from his chest. Juan Lopez, the victim's older brother and 14 years old at the time of the incident, testified that he was in a van with David Brecheisen, his local youth-program counselor, at about 6 p.m. when he saw his brothers Miguel and Angel playing on the street. Juan and David were stopped at a red light when Juan saw three

vehicles--a beige car followed by a black car and a van--turn in front of them and speed away; he also heard gunshots. When Juan arrived at David's house, he went inside and placed a 911 call to report the reckless driving. He then went back outside and saw his brother Miguel lying on the ground. Brecheisen corroborated much of Juan's testimony, stating that a beige car followed by a van pulled out right in front of his vehicle at an intersection and sped away. Brecheisen continued to his home, dropped Juan off and then drove down the street where a crowd of people had begun to gather. He saw Miguel on the ground.

Finally, a videotaped statement given by defendant to police in the days following Miguel's death was played for the jury. In the statement, defendant admitted he was a member of the Spanish Cobras street gang and that on July 19, 2000, he was at a barbeque at his grandmother's house with Labellarte and Gambill. Defendant stated that he and Labellarte decided to walk down the street to a nearby corner which bordered on rival Latin King gang territory. Defendant saw Ellison and had an argument with him, which defendant stated was because Ellison thought defendant was looking at and getting too close to Ellison's black Delta parked on the street. Defendant stated that at this point, Ellison told him he had "cannon toys," or guns. Defendant and Labellarte then went back to defendant's grandmother's house, whereupon they saw Gambill on the street and Coronado driving up in his Bonneville. Defendant stated he told Gambill to get "the strap," meaning the .380 semiautomatic gun shared by the Spanish Cobras, because the Latin Kings were "coming." As defendant, Gambill, and Labellarte got into Coronado's car, Gambill gave defendant the gun; defendant hid the gun in his lap underneath his shirt. Defendant further stated that a chase ensued with Ellison's car following

6

No. 1-05-2805

Coronado's car and Torres' beige van following Ellison's car, and later, Torres' van was following Coronado's car with Ellison's car behind the van. Defendant also stated that everyone in Coronado's car was telling him to shoot at Ellison and Torres, so he stood up through the sunroof and shot four times. He never saw anyone in Ellison's car or Torres' van with a gun. Following the shooting, defendant went home and hid the gun he had used. He averred that the next day, when he had heard that Miguel had died, he met with Labellarte and Gambill and the three created an alibi that they were still at the barbeque at the time of the shooting.

Following the State's rebuttal closing argument, which discussed several aspects of the trial, the court instructed the jury regarding two types of first degree murder: felony murder based on aggravated discharge of a firearm, and knowing and intentional murder which included an instruction on second degree murder. The court also instructed the jury regarding self-defense. The jury returned guilty verdicts for first degree murder on both types. Defendant was sentenced to the minimum term of 45 years in prison.

ANALYSIS

As noted, defendant presents three contentions on appeal. We address each separately.

I. First Degree Murder Convictions

Defendant's first contention for review is that both of his convictions for first degree murder were improper. Regarding his conviction for felony murder based on aggravated discharge of a firearm (referred to at trial as "type B"), defendant, relying wholly on People v. Morgan, 197 Ill. 2d 404 (2001), argues that the aggravated discharge was inherent in the act of murder here and, thus, could not be a predicate offense for a felony murder charge. Regarding

7

his conviction for knowing and intentional murder (referred to at trial as "type A"), defendant argues that the jury instructions and the State's closing argument improperly precluded the jury from ever considering self-defense or second degree murder. We disagree with both arguments.

First, as to felony murder, we note that a person commits this crime when he, without lawful justification, causes another's death while attempting or committing a forcible felony other than second degree murder. See 720 ILCS 5/9-1(a)(3) (West 2000). A forcible felony includes aggravated discharge of a firearm. See 720 ILCS 5/2-8 (West 2000); People v. Toney, 337 Ill. App. 3d 122, 130-31 (2003). Under the felony murder doctrine, a felon is responsible for the direct and foreseeable consequences of his actions. See People v. Belk, 203 Ill. 2d 187, 192 (2003); see People v. Pugh, 261 Ill. App. 3d 75, 77 (1994) (this is true regardless of whether the defendant intended to kill the victim or whether the death was accidental). The purpose behind this doctrine is to limit the violence that accompanies the commission of forcible felonies, so that anyone who commits such a violent felony will be automatically subject to a murder charge if someone is killed during the commission of that felony. See Belk, 203 Ill. 2d at 192.

Defendant is correct that in Morgan, our state supreme court held that a conviction for felony murder based on aggravated discharge of a firearm was legally inappropriate. In that case, the defendant shot his grandfather during a confrontation and his grandmother as she was fleeing; he was found guilty of, in part, felony murder. See Morgan, 197 Ill. 2d at 411-12. He argued on appeal that this conviction could not stand because the charged predicate felony, aggravated discharge, was not independent of the killings. See Morgan, 197 Ill. 2d at 444-45. The supreme court agreed. In discussing the felony murder doctrine, the Morgan court was concerned that,

8

since intent to kill need not be proven in the prosecution of a felony murder charge, the State would be absolved from its duty to prove that a defendant has either an intent to kill or to do great bodily harm. See Morgan, 197 Ill. 2d at 447; see also People v. Davis, 213 Ill. 2d 459, 471-72 (2004) (discussing Morgan). Thus, the Morgan court sought to prevent situations where the same evidence is used to prove the underlying felony and the actual killing, because it is in these where it is difficult to conclude that the underlying felony involved a felonious purpose other than the killing of the victim, in accordance with our statutory law. See Morgan, 197 Ill. 2d at 447; see also Davis, 213 Ill. 2d at 471. Consequently, the Morgan court issued the holding that a defendant cannot be convicted of felony murder when the predicate felony "arose from and [was] inherent in the murder[]." Morgan, 197 Ill. 2d at 447 (where "the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder").

Simply put, Morgan requires a review of the facts of each case to determine whether the predicate felony "arose from" or was "inherent in" the murder of the victim: if so, a felony murder charge is not legally proper, but if not, a felony murder charge is appropriate. See Toney, 337 Ill. App. 3d at 132 ("the factual context surrounding the murder is critical in determining whether the forcible felony can serve as a predicate felony for felony murder"); see also People v. Pelt, 207 Ill. 2d 434, 442-43 (2003) (the predicate felony underlying the charge of felony murder must involve conduct with a felonious purpose other than the conduct which killed the victim). We have no concern with the holding of Morgan. It was clear there that the predicate felony of aggravated discharge of a firearm arose from and was inherent in the murders in that case.

9

Specifically, the defendant's act of shooting a gun at his grandfather and then his grandmother formed the basis of the aggravated battery conviction; yet, it was also the same act underlying the murder conviction. There was no way to conclude in that particular case that the aggravated discharge involved conduct with a felonious purpose *other* than the conduct which killed the grandparents. Thus, the felony murder charge could not stand.

The same cannot be said in the instant case, and we plainly disagree with defendant that Morgan is in any way applicable to the facts involved herein. Defendant's conduct of shooting his gun through the sunroof at Ellison's car and Torres' van was not an act that was inherent in or arose out of the killing of Miguel. That is, the aggravated discharge was not inherent in the murder of Miguel but, rather, involved conduct with a felonious purpose *other* than killing Miguel, namely, shooting at Ellison and Torres, both of whom were nowhere near Miguel at the time. Unlike in Morgan, where it could be said that the aggravated discharge and the murders were one and the same, the situation here is not muddled. Defendant's shooting at Ellison and Torres is the conduct which formed the basis of the aggravated discharge of a firearm charge; his separate shooting (and hitting) of Miguel is the conduct which formed the basis of the murder.

At their core, the facts here comprise a gang shooting resulting in the death of an innocent bystander. As such, they mirror, as the State points out, People v. McGee, 345 Ill. App. 3d 693 (2003), and Toney, 337 Ill. App. 3d 122, cases which came before our very court. In McGee, the defendant, a member of a local gang, became involved in an altercation with a rival gang; a rival gang member opened fire and defendant returned fire, shooting three times from a car and two more times after having exited the car. A baby was caught in the cross-fire and was killed.

10

Following a conviction for felony murder based on aggravated discharge of a firearm, the defendant argued on appeal, in part, that his conviction could not stand pursuant to Morgan. Our court disagreed and upheld the conviction. While we found nothing inappropriate in Morgan's holding, we noted that the facts presented were clearly distinguishable from that case because the predicate felony of aggravated discharge did not arise from and was not inherent in the murder of the baby but, rather, involved conduct with an independent felonious purpose other than killing the baby (*i.e.*, shooting at the rival gang member). See McGee, 345 Ill. App. 3d at 698-99 (holding that based on facts, aggravated discharge can serve as predicate felony for felony murder). Similarly, in Toney, the gang-member defendant was involved in an altercation with members of a rival gang and shots were fired; a bystander was shot and killed. The defendant was convicted of felony murder based on aggravated discharge of a firearm and he too argued on appeal that this was not proper pursuant to Morgan. Again, reviewing the particular circumstances presented, we upheld the defendant's conviction finding that, because it was clear that the acts constituting the aggravated discharge were not inherent in the act of murdering the bystander but, rather, involved conduct with a felonious purpose other than killing the bystander (*i.e.*, discharging firearms at rival gang members), aggravated discharge was a proper predicate felony for the felony murder conviction. See Toney, 337 Ill. App. 3d at 134, 137.

It is clear that the instant case is identical to McGee and Toney and merits the same result. While we reiterate that we find no fault in Morgan, there is nothing in the discussion and application of its holding that would preclude application of the felony murder rule in the instant case. See Toney, 337 Ill. App. 3d at 135 (noting that Morgan does not preclude affirmance of

felony murder conviction in that case); accord Davis, 213 Ill. 2d at 474-75 (affirmance of felony murder conviction proper even in light of Morgan). Contrary to defendant's contention, the facts of Morgan have no bearing here and, based on the instant circumstances presented, we find that the charge of aggravated discharge of a firearm was a proper predicate felony for the felony murder charge. See, *e.g.*, McGee, 345 Ill. App. 3d 693; Toney, 337 Ill. App. 3d 122; see also Davis, 213 Ill. 2d at 470-75 (where the defendant's conduct was not act that was inherent in or arose from killing, predicate felony was proper for felony murder charge); People v. Boyd, 356 Ill. App. 3d 254, 261 (2005) (where the defendant did not intend to kill victim but only to scare third party, aggravated discharge of firearm was not act inherent in murder; fact that the defendant did not intend to kill this victim distinguishes case from Morgan where that defendant intended to and killed grandparents and thus could not be charged with felony murder).

We now turn to defendant's contention that his conviction for knowing and intentional murder was improper because the instructions given at trial prevented the jury from considering self-defense or a mitigating charge of second degree murder.[1] He insists that when the trial court

---

[1]We note for the record that the State makes a threshold argument that defendant has waived this issue for review since he failed to comply with Illinois Supreme Court Rule 341(h)(7), which requires briefs on appeal to contain citations to authorities used to support an argument. See 210 Ill. 2d R. 341(h)(7). It is true that defendant fails to cite any authority for the instant argument and, thus, we may consider it waived. See, *e.g.*, People v. Urdiales, 225 Ill. 2d 354 (2007). However, in an effort to make a complete record, we choose to review his claim. See People v. Kliner, 185 Ill. 2d 81, 127 (1998).

told the jury that "a person is not justified in the use of force if he is attempting to commit or committing aggravated discharge of a firearm," it did so in reference to the knowing and intentional murder charge rather than the felony murder charge or, at the very least, confused the situation for the jury. He argues that, since he necessarily admitted to the aggravated discharge in order to raise the affirmative defense of self-defense, "the jury had no choice" but to find him guilty of felony murder pursuant to these words.

The purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thereby allowing it to reach the proper conclusion based on the applicable law and the evidence as presented. See People v. Parker, 223 Ill. 2d 494, 500 (2006); accord People v. Hudson, 222 Ill. 2d 392, 399 (2006). The issue of whether the applicable law was accurately conveyed to the jury through the instructions given is reviewed *de novo*. See Parker, 223 Ill. 2d at 501; People v. Herron, 215 Ill. 2d 167, 174 (2005). As a reviewing court, we are to determine whether the instructions given, when taken as a whole, fairly, fully and comprehensively apprised the jury of the relevant legal principles presented by the State and the defense. See Parker, 223 Ill. 2d at 501, citing People v. Terry, 99 Ill. 2d 508, 516 (1984); accord Hudson, 222 Ill. 2d at 399. Significantly, we must construe the instructions as a whole rather than read them in isolation. See Parker, 223 Ill. 2d at 501; People v. Ward, 187 Ill. 2d 249, 265 (1999).

Reviewing the jury instructions given by the trial court here as a whole, we disagree with defendant and find that they fairly and fully stated the law involved in this case as it related to the evidence. The record makes clear that the jury was instructed regarding all of the following:

13

felony murder based on aggravated discharge of a firearm, knowing and intentional murder, second degree murder and self-defense. The jury, then, was presented with instructions and verdict forms for each possible charge, including the lesser offense of second degree murder and the affirmative defense of self-defense. Regarding knowing and intentional murder in particular, the trial court specifically explained to the jury that if it believed the State had met its burden for this crime, it should then consider whether there was any mitigating factor proven so that defendant would be guilty of second degree murder instead. The jury was also presented with instructions describing potential mitigating factors. Thus, it is clear that the jury was fully and properly apprised of knowing and intentional murder and its ability to find defendant guilty, not guilty or guilty of second degree murder.

Moreover, we note that the jury was given a separate jury instruction on felony murder. It was specifically in reference to this type of murder charge that the jury was told, as defendant cites, that he could be found guilty of first degree murder if he was committing aggravated discharge of a firearm at the time of the victim's death. As we view this instruction in the record, its preface was: "A person commits the offense of first degree murder (Type B) ***," thus clearly referencing the jury to the fact that this instruction regarding aggravated discharge applied to felony murder only. The trial court never mentioned this, nor was the jury ever so instructed, when knowing and intentional murder was presented and discussed. Ultimately, the jury received separate verdict forms on each charge: three for knowing and intentional murder (guilty, not guilty or guilty of second degree murder), and two for felony murder (guilty or not guilty). Even if the trial court had made some sort of error in an oral sense when it discussed aggravated

14

discharge, it was harmless, particularly because the record shows that correct written instructions were submitted to the jury. See People v. Williams, 181 Ill. 2d 297, 321-22 (1998) (receipt of corrected instruction helps to cure error in oral instruction, even when jurors have indicated they reached their verdict prior to receiving the corrected version); accord People v. Kitchen, 159 Ill. 2d 1, 39-40 (1994).

Defendant's argument that comments made by the State during closing argument further confused the jury so as to preclude it from considering second degree murder or self-defense is also unsupported by the record. Defendant cites the following comment by the State:

> "If you find that he discharged that firearm, that he – and caused the death of that little boy while doing so, he is guilty of murder, and their entire self-defense garbage that you heard about in this courtroom doesn't apply to that charge – you do not even look at self-defense or second-degree."

However, defendant isolates one sentence from the State's lengthy closing argument made in its rebuttal to defendant's own closing argument, which focused on the sufficiency of the evidence and advocated for, if any sort of conviction, something less than first degree murder. Viewed in light of the entire exchange between both parties, as we are required to do (see People v. Cisewski, 118 Ill. 2d 163, 176 (1987)), we find no error. First and foremost, defendant erroneously cites the above comment, conveniently leaving out a significant phrase. According to the record, the State actually said:

> "If you find that he discharged that firearm, that he – and caused the death of that little boy while doing so, he is guilty of murder, and their entire self-

15

defense garbage that you heard about in this courtroom doesn't apply to that charge. *You may not consider that defense as to that charge. The Type B murder – you do not even look at self-defense or second-degree.*" (Emphasis added.)

Clearly, and in direct contrast to defendant's assertion, it is unmistakable that the State's comments were made when discussing the felony murder charge, not the knowing and intentional murder charge. Before this cited comment, the State discussed with the jury that there was a "big legal significance to the two different types" of murder charges here; it then made the cited comment right after telling the jury that "Type B felony murder -- you are going to get this big pile of instructions" regarding it. Moreover, the State continued immediately after this comment by further describing felony murder and then distinguishing it from knowing and intentional murder, at which point it explained to the jury that if it believed the State failed to prove felony murder, it must review the knowing and intentional charge and consider both second degree murder and self-defense. There is no semblance here of any sort of indication that the cited comment by the State somehow "confused" the two types of murder charges for the jury, blended the charges together, or led it to ignore the alternatives of second degree murder and self-defense. With the comment, the State was simply demonstrating that the defendant's claims of second degree murder and self-defense were not supported by the evidence.

Based on all this, it is clear to us that, when the instructions given to the jury here are viewed as a whole, they fully, fairly and properly apprised the jury of the correct legal principles that applied to the evidence and the circumstances presented allowed it to reach a proper conclusion.

## II. Character Evidence

Defendant's next contention on appeal is that the trial court erred in barring evidence he sought to present regarding the violent characters of Ellison and Torres to show why he responded to the car chase by firing a weapon. Relying principally on People v. Lynch, 104 Ill. 2d 194 (1984), he argues that because evidence of Ellison's and Torres' characters bore directly on the issue of whether he "had reason to fear the attack or to resort to self-defense," the trial court violated his rights to due process and a fair trial.

The determination of the admissibility of evidence lies within the province of the trial court, and it may reject evidence, even relevant evidence, if it is remote, uncertain or speculative. See Morgan, 197 Ill. 2d at 456. A trial court's ruling regarding relevance and admissibility of evidence will not be reversed absent a clear abuse of discretion and manifest prejudice. See, *e.g.*, People v. Sutherland, 223 Ill. 2d 187 (2006).

Defendant is correct that Lynch provides the seminal law regarding the admissibility of character evidence in cases where self-defense has been raised. In Lynch, the defendant's physically and mentally handicapped son wrecked Ernest Bell's car. Bell demanded money for the repairs, but estimates were more than the defendant could pay. Bell became angry and said he would get his money. Later, the defendant arrived at his son's apartment to see Bell and his friend Lester Howard inside talking to the defendant's son; these men were bigger than the defendant and were drunk. The subsequent evidence "was conflicting." Lynch, 104 Ill. 2d at 198. The defendant testified that Howard lunged forward, reaching behind his back and underneath his coat with his right hand; thinking Howard was going to shoot him, the defendant

pulled out a gun and shot Howard in the head, killing him. Bell, however, testified that Howard's hands were in front of him at this time. At trial, the defendant raised self-defense. In an effort to show that Howard, the victim, had a propensity for violence and that this supported his version of the facts, the defendant sought to introduce evidence that Howard had three prior battery convictions. The trial court prohibited this evidence.

The Lynch court reversed the trial court's decision and remanded the cause for the introduction of the victim's convictions. The Lynch court held that when self-defense "is properly raised, evidence of the victim's aggressive and violent character may be offered for two reasons: (1) to show that the defendant's knowledge of the victim's violent tendencies affected [his] perceptions of and reactions to the victim's behavior; and (2) to support the defendant's version of the facts where there are conflicting accounts of what happened." People v. Nunn, 357 Ill. App. 3d 625, 631 (2005) (reviewing and summarizing holding of Lynch). Accordingly, under the first approach, the evidence is relevant only if the defendant knew of the victim's violent acts. See Nunn, 357 Ill. App. 3d at 631; see also Lynch, 104 Ill. 2d at 200 (in this first prong, only the facts the defendant knows can be considered and "evidence of the victim's character is irrelevant to [the] theory of self-defense unless the defendant knew of the victim's violent nature"). Under the second approach, the defendant's knowledge is irrelevant, but there must be conflicting accounts of what occurred in order for the evidence to be admissible. See Nunn, 357 Ill. App. 3d at 631 (whether the defendant knew of the evidence at the time of the event does not matter); accord Lynch, 104 Ill. 2d at 200-01.

Having outlined the main legal principles involved, we now turn to defendant's arguments

18

concerning the character evidence he sought to introduce about Ellison and Torres in support of his assertion of self-defense, which the trial court ultimately barred.[2]

We begin by noting that in any Lynch situation, we must first decide whether the defendant was entitled to introduce Lynch evidence at all, that is, whether he properly raised a theory of self-defense in his cause thereby meriting consideration of the Lynch principles. See Nunn, 357 Ill. App. 3d at 631 (reviewing cause to first determine if self-defense was supported by evidence presented); accord People v. Armstrong, 273 Ill. App. 3d 531, 533-34 (1995) (Lynch applies only where the theory of self-defense is properly raised). In the instant case, we find very little evidence, if any, supporting defendant's theory of self-defense. Following his encounter with Ellison on the street, defendant and Labellarte walked back to defendant's grandmother's house. Accordingly to his own confession, defendant, at this point, told Gambill to get him the Spanish Cobra nation gun to use on Ellison. Gambill did, and defendant took the gun and hid it under his shirt when he entered Coronado's car. Clearly, defendant chose to perpetuate the situation when he could have easily removed himself from any confrontation, particularly since Ellison was still down the street at this time and defendant had returned to his grandmother's house. Moreover, there was no evidence that Ellison or Torres had a weapon. To the contrary, all the witnesses who testified at trial on this subject, including Labellarte, Coronado, Ellison and

---

[2]We note for the record that defendant makes strong arguments in his brief regarding the Lynch issue. While the State has technically countered them in its brief on appeal and while our decision is ultimately in its favor, the State provided only a dangerously cursory rebuttal at certain points. Thus, we feel that our discussion regarding Lynch, though lengthy, is required.

19

Kirkland, stated that no one in Ellison's car or Torres' van had or displayed any sort of weapon during the chase. It was only defendant who stood up through the sunroof of a moving vehicle and shot a gun. Furthermore, Labellarte and Coronado testified that neither knew defendant was armed and no one in the car encouraged defendant to shoot at anyone, with Coronado stating that he was certain he could outmaneuver Ellison and Torres during the chase and that after defendant fired the gun, he asked him, in more pointed terms, what he thought he was doing. Testimony was also provided that the chase brought the cars right near a police station, but defendant did not ask to stop to seek assistance. From all this, it is clear that defendant became the aggressor when he fired the shots and that, accordingly, any Lynch material was properly barred since self-defense was not properly raised. See Nunn, 357 Ill. App. 3d at 631 (where the defendant "became the aggressor when he shot at the car," instead of avoiding confrontation where no one else had weapon, he was not entitled to introduce Lynch evidence since there was no evidence to support his theory of self-defense); accord Armstrong, 273 Ill. App. 3d at 533-34 (where, by own testimony, the defendant perpetuated hostilities by displaying weapon, making threats, continuing argument and pulling gun on unarmed victim, she became aggressor and Lynch principles did not apply, since self-defense was not properly raised).

There is another reason we hold that Lynch does not apply at all in the instant case, one that is technical but nevertheless well grounded. Very simply, Lynch deals with aggressive or violent character evidence of the defendant's *victim*, to show that the defendant was justified in harming the victim because the victim was the primary aggressor. This was the very essence of Lynch--that court allowed the defendant to submit evidence of Howard's three prior battery

20

convictions to show that Howard was a violent man and that defendant was justified in shooting Howard; the defendant was not seeking to introduce evidence regarding Bell or anyone else at the scene. However, in the instant case, defendant attempts to do just that. He is seeking to introduce character evidence of Ellison and Torres, people who were at the scene but not his victims. Defendant was not charged with felony murder or knowing and intentional murder of Ellison and Torres but, rather, of Miguel. Lynch cannot apply here because "its predicate is missing": Ellison and Torres were not defendant's victims, Miguel was. People v. Bridges, 188 Ill. App. 3d 155, 159 (1989) (trial court's decision to bar character evidence of man who only stood next to car as the defendant and another fought was proper because Lynch did not apply as man was not the defendant's victim but only a bystander and, thus, his character was "irrelevant"; reviewing court affirmed that "[w]e are not prepared to extend Lynch to cover a bystander. After all, to do so would have the effect of making a man with a violent past fair game for killing"). As defendant provides no case law to counter this principle, we find no reason to extend Lynch in this case to cover Ellison or Torres.

Even were we to bypass these concerns and analyze the merits of defendant's claims regarding Ellison and Torres as they relate to Lynch, we find no error with the trial court's decision to bar the evidence defendant proposed.

### A. Evidence of Ellison's Character

Regarding Ellison, we first note that, as a threshold matter, the State insists that defendant has forfeited this issue for our review since he did not properly preserve it. We agree. In his posttrial motion, while defendant asserts trial court error for its refusal to admit character

21

evidence regarding Torres, he fails to mention the court's similar decision regarding Ellison. Having done so, defendant has technically waived the issue of character evidence regarding Ellison. See, *e.g.*, People v. Enoch, 122 Ill. 2d 176 (1988) (failure to both object at trial and raise issue in posttrial motion waives it for appellate review).

However, even choosing to review this issue (see Kliner, 185 Ill. 2d at 127), we still disagree with defendant's assertion that the trial court erred in refusing to admit evidence that Ellison had twice faced murder charges before the incident in the present case occurred: a murder charge in 1990 of which he was acquitted, and a murder charge which was dismissed in 1996 or 1998 prior to trial when it was discovered that a witness had been bribed to state that Ellison had been involved in a shooting.

As noted earlier, Lynch material is admissible in two situations: to show that the defendant's knowledge of the victim's violent tendencies affected his perception and reaction to the victim's behavior, and to support the defendant's version of events where there are conflicting accounts of what happened. See Lynch, 104 Ill. 2d at 199-200. Under the first approach, Lynch material is relevant and admissible only if the defendant knew of the victim's violent acts that he seeks to introduce. See Lynch, 104 Ill. 2d at 200; Nunn, 357 Ill. App. 3d at 631. This is because the same deadly force that would be unreasonable in an altercation with a peaceful citizen may be reasonable in a similar situation involving a citizen with a violent or aggressive character. See Lynch, 104 Ill. 2d at 200. Thus, "[o]ne can only consider facts one knows"; if the defendant did not know about the victim's violent nature at the time in question, the character evidence is irrelevant to his theory of self-defense. Lynch, 104 Ill. 2d at 200. Moreover, in any self-defense

22

case, the defendant's state of mind is a material issue; only he can provide direct evidence of his reasons for committing the crime. See People v. Phillips, 371 Ill. App. 3d 948, 952 (2007).

In the instant case, defendant did not provide any evidence as to his state of mind at the time of the incident. He did not testify at trial and there was nothing in his confession to indicate whether he knew of Ellison's prior murder charges. Defendant did elicit at trial from both Labellarte and Coronado that they were scared during the car chase. However, what Labellarte and Coronado felt or thought does not matter; their actions are not at issue and neither could testify as to what defendant knew at the time. Only defendant's actions were at issue and only defendant could testify as to his state of mind. See, *e.g.*, Phillips, 371 Ill. App. 3d at 952. Therefore, defendant does not meet the first approach of Lynch. See, *e.g.*, Morgan, 197 Ill. 2d at 457 (where the defendant provided no testimony that he was aware of mother's childhood experiences with his grandparents, any testimony regarding these could not have affected his perceptions and reactions and, thus, was inadmissible under Lynch).

Under the second Lynch approach, a defendant has the right to present evidence of the victim's character for violence, regardless of his knowledge of this at the time, if there are conflicting accounts of what happened. See Lynch, 104 Ill. 2d at 200; Nunn, 357 Ill. App. 3d at 631. For example, in Lynch, the defendant testified that the victim lunged at him with his right hand reaching behind his back, while an eyewitness testified that the victim's hands were in front of him. See Lynch, 104 Ill. 2d at 198, 199 ("[m]uch of the evidence was conflicting" "about the details of the events just before the shooting"); see also People v. McGee, 213 Ill. App. 3d 458, 469 (1991) (evidence in Lynch about events leading to shooting "was disputed").

23

In the instant case, there is no conflict here regarding the events that took place just before the shooting. While it is true that there may be some minor discrepancies regarding the moments early on when defendant and Ellison first exchanged words on the street, all the pertinent witnesses at trial testified that defendant left and went back home toward his grandmother's house. No one disputes that the start of the car chase did not occur until gang signs were exchanged. There is also no dispute, as per defendant's own confession, that he stood up in Coronado's car during the chase and began to shoot through the sunroof, although no one in Ellison's car or Torres' van had shot at him or displayed any sort of weapon. Whether Ellison believed someone from Coronado's car threw a bottle at his car during the chase or whether Ellison had initially told defendant in their first exchange that he had "cannon toys" (guns) is irrelevant to whether defendant's response of opening fire on the street to Ellison's chase was reasonable. Even if it were, again, what Ellison believed occurred has nothing to do with defendant's assertion of self-defense, and defendant's statement about the "cannon toys" was inconsistent with Labellarte's and Ellison's testimonies about that exchange. Unlike the situation in Lynch, there was no conflict here. Therefore, defendant also does not meet the second approach. See McGee, 213 Ill. App. 3d at 469-70; see, *e.g.*, Morgan, 197 Ill. 2d at 457-58 (mother's childhood experiences not admissible under second Lynch approach where "there were no conflicting accounts of what had happened" as per the defendant's testimony and statements).

Finally, even if the trial court erred in barring defendant from introducing evidence of Ellison's prior murder charges, this error was harmless. See People v. Collins, 366 Ill. App. 3d 885, 893-94 (2006) (applying harmless error analysis to Lynch issue and finding no such error in

24

barring evidence). Ellison's murder charges were just that--*charges*. He was never convicted; in fact, he was acquitted of the 1990 charge, and the 1996 or 1998 charge was nol prossed when it was discovered that the main witness was bribed to say Ellison was involved. While defendant is correct in stating that "a prior altercation or arrest, without a conviction, can be adequate proof of violent character," "Lynch and its progeny unquestionably hold that proof is needed that the victim committed the crimes." People v. Cook, 352 Ill. App. 3d 108, 128 (2004) (noting this dichotomy and holding that Lynch evidence was not admissible since further proof, other than charges of battery, was required to demonstrate victim's alleged violent character). Here, there was no evidence to support the assertion that Ellison actually performed any of the murders charged. See People v. Ellis, 187 Ill. App. 3d 295, 301 (1989) ("evidence of a victim's mere arrest is inadmissible since it does not indicate whether the victim actually performed any of the acts charged"); see, *e.g.*, People v. Costillo, 240 Ill. App. 3d 72, 82 (1992) (Lynch material properly excluded where it comprised only charges, not conviction).

Moreover, other factors involved indicate a lack of reliable foundation for this evidence. See Nunn, 357 Ill. App. 3d at 632 (analyzing purpose of Lynch material, as well as foundation, whether it was cumulative of other evidence presented, etc.); accord People v. Ware, 180 Ill. App. 3d 921, 929 (1988) (where Lynch evidence was too general, indefinite and could not be viewed as reliable and *prima facie* probative of aggressive violent tendencies, it was properly barred); see also, *e.g.*, Lynch, 104 Ill. 2d at 203-04 (examining context of convictions when determining admissibility). In addition to never having been convicted of the murders, we note that they occurred long before the incidents at issue; for example, Ellison's trial resulting in

acquittal occurred in 1990, some 10 years before Miguel's shooting. A remoteness factor is clearly relevant here. See Morgan, 197 Ill. 2d at 455-57 (rejecting Lynch evidence because it was remote to incident at issue); see also Ellis, 187 Ill. App. 3d at 301 (trial court has discretion to exclude admission of evidence of conviction which is 10 or more years old). Also, the circumstances surrounding Ellison's nol prossed charge illustrate the factors of speculation and unreliability; that charge was specifically dismissed before trial even began because a witness lied about Ellison's involvement. And, ultimately, the evidence here regarding defendant's guilt was overwhelming. While defendant seems to reduce this case to a issue of credibility between him and Ellison, he ignores that it was Miguel who was killed. Defendant's confession to police only days after the incident mentioned nothing about his fear of Ellison or of Ellison's alleged character or reputation for violence. Therefore, we find that the trial court did not abuse its discretion in barring the proposed evidence of Ellison's character.

*B. Evidence of Torres' Character*

Regarding Torres, the character evidence defendant sought to introduce, and which was barred by the trial court, was presented in an offer of proof via the testimony of two women, Crandall and Candelaria. During the offer of proof, CAPS worker Crandall testified that she had an encounter with Torres on June 22, 2001, where he approached her and told her to stop calling the police "or else"; Candelaria testified that she had an encounter with Torres on June 12, 2001, where, after she confronted him about opening a fire hydrant, Torres laughed, displayed a gun and told her he was going to kill her.

First and foremost, it is clear that Lynch's first approach is not applicable in this situation.

26

Both of these incidents postdate the incident that occurred in the instant case. That is, Miguel was shot and killed on July 19, 2000, while the encounters testified to by both Crandall and Candelaria did not take place until almost a year later. Since the first Lynch approach focuses on what a defendant knew about the victim and the defendant's perceptions of and reactions to the victim's behavior in the context of his knowledge, it cannot be a basis for the admissibility of the evidence regarding Torres cited here. See Nunn, 357 Ill. App. 3d at 631 (under first Lynch approach, evidence of victim's violent tendencies is relevant only if the defendant knew of victim's violent acts); see, *e.g.*, Lynch, 104 Ill. 2d at 200.

The issue remains, then, whether this evidence regarding Torres should have been admitted by the trial court under the second Lynch approach. We find that the trial court properly barred it.

Defendant is correct that evidence of incidents of violence that postdate the crime for which a defendant is being tried may be admissible under the second Lynch approach to determine who was the aggressor. See People v. Ciavirelli, 262 Ill. App. 3d 966, 972 (1994). However, all the relevant principles of this approach, which we have already discussed, must still be met.

In the instant case, Torres' role as "aggressor" is tenuous at best. This is not meant to justify or diminish Torres' actions on the afternoon of Miguel's murder. However, it does demonstrate both the somewhat faulty nexus defendant tries to establish between Torres and himself and the resulting inapplicability of Lynch, even under its second approach. The confrontation in this case from which an initial aggressor is to be named was between defendant

27

and Ellison and occurred on the street before the car chase began. At this point, Torres was nowhere to be found. Torres was not present or involved during this altercation, which resulted in defendant going back to his grandmother's house and obtaining a gun to use because, as he stated in his confession, he believed Ellison was "coming" after him due to their prior exchange. Torres arrived only later. The scene for the chase and, in turn, for defendant's action of using the gun had already been set by the exchange between defendant and Ellison; in fact, all the witnesses to the chase testified that the chase began with Ellison directly behind defendant and Torres joining only later. This leaves only defendant and Ellison as the answers to the question of who was the initial aggressor in this cause. Thus, any evidence of violent acts involving Torres as testified to by Crandall and Candelaria would be extraneous and irrelevant, even under Lynch's second approach. See Ciavirelli, 262 Ill. App. 3d at 972-73 (where there is no evidence that any man involved in alleged violent incidents was the aggressor in shooting at issue, evidence of those incidents was not admissible under second Lynch approach); see also People v. Pogue, 312 Ill. App. 3d 719, 729 (1999) (where there could only be one possible aggressor in group (other than the defendant claiming self-defense), evidence of violent propensities of others in group is irrelevant and inadmissible under Lynch).

Even were this not so, any error committed by the trial court in barring the evidence gleaned in the offer of proof regarding Torres was harmless. Again, as with Ellison, Torres was not convicted in either instance testified to by Crandall or Candelaria. See, *e.g.*, Costillo, 240 Ill. App. 3d at 82; Ellis, 187 Ill. App. 3d at 301. And, most significantly, the evidence against defendant in this cause was overwhelming. In addition to the testimony at trial, defendant

28

himself confessed to police that he chose to walk down the street into rival gang territory, that he then returned home and obtained a gun, and that he stood up through the sunroof of Coronado's car and fired four times out into the street, even though he was never fired upon and did not see any weapons displayed by Torres or anyone in his van. Particularly, defendant never discussed in his confession any fear he experienced due to Torres during any point of this incident. Therefore, we find that the trial court did not abuse its discretion in barring the proposed evidence of Torres' character.

Based on all this, we find that, ultimately, the trial court's decision to bar the proposed Lynch material regarding Ellison and Torres was proper in the instant case.

### III. State's Rebuttal Closing Argument

Defendant's final contention on appeal is that his conviction should be reversed and his cause remanded for a new trial because the State's rebuttal closing argument was prejudicial in multiple respects. He cites four portions of the State's argument, asserting that the State improperly commented on his failure to testify, bolstered the credibility of Coronado, inflamed the passions of the jury, and personally disparaged him based on facts not in evidence. We disagree.

It is well established that the State is allowed a great deal of latitude in closing argument. See People v. Nieves, 193 Ill. 2d 513, 532 (2000); accord People v. Wiley, 165 Ill. 2d 259, 294 (1995). The test for determining whether there was reversible error because a remark resulted in substantial prejudice to the defendant is whether the remark was a material factor in his conviction, or whether the jury would have reached a different verdict had the State not made the

remark. See People v. Flax, 255 Ill. App. 3d 103, 109 (1993); accord Nieves, 193 Ill. 2d at 533. We review the allegedly improper remark in light of all the evidence presented against the defendant (see Flax, 255 Ill. App. 3d at 109), as well as within the full context of the entire closing argument (see Cisewski, 118 Ill. 2d at 176). We note here that the State is entitled to respond to a defendant's closing argument which attacks its case and witnesses, and the defendant cannot claim prejudice when these comments are invited by his own argument. See People v. Reed, 243 Ill. App. 3d 598, 606-07 (1993); accord Nieves, 193 Ill. 2d at 534 (the defendant cannot rely upon invited response by State during rebuttal closing argument as error on appeal). The trial court is in the best position to determine whether comments made during closing argument resulted in prejudice and, thus, its determination that such comments are proper will not be reversed absent an abuse of discretion. See People v. Emerson, 189 Ill. 2d 436, 488 (2000); see also People v. Robinson, 254 Ill. App. 3d 906, 915 (1993); Reed, 243 Ill. App. 3d at 605 ("scope" of closing "is left largely up to the trial court"). Ultimately, unless deliberate misconduct by the State during closing argument can be demonstrated, comments will be considered incidental and uncalculated and will not form the basis of reversal. See People v. Cloutier, 156 Ill. 2d 483, 507 (1993).

In his first citation of error, defendant claims that the State improperly commented on his failure to testify, in violation of his constitutional right not to do so, when it commented to the jury that:

"There is not one shred of evidence that you heard in this courtroom about self-defense, about his state of mind, what's in his state of mind, not everybody

30

else's state of mind. Self-defense is his state of mind";

and later:

"And you did not hear any evidence that this defendant in his mind was in fear when he shot his gun."

Contrary to defendant's assertion, it is clear to us that the State's comments here were not directed at defendant's failure to testify but, rather, on his failure to support his theory of self-defense. This was the essence of defendant's case, namely, that he shot Miguel while trying to defend himself against Ellison and Torres. An evaluation of such a theory requires the jury to decide whether defendant was justified in his actions, including what he believed and/or perceived at the time of the incident. See McGee, 213 Ill. App. 3d at 464 (describing elements of self-defense, including that the defendant reasonably believed force used was necessary). In fact, defendant spent a great portion of his closing argument imploring the jurors to consider the circumstances he was presented with at the time of the incident, to remember this context, and to evaluate what they would do if they were in fear for their lives. By its comments, the State simply responded to this by pointing out for the jury that, while evidence was presented regarding the feelings and states of mind of other witnesses such as Labellarte and Coronado, there was no reliable evidence regarding defendant's state of mind, which was key to his defense. Defendant insists that there was such evidence in his videotaped confession; however, after viewing that confession, we note that nowhere in it does defendant talk about his state of mind at the time of the shooting. Moreover, contrary to defendant's argument, the State never commented that defendant did not testify. Rather, it was defense counsel who stated this during closing argument when, as part of

31

an objection to the State's argument, defense counsel told the jury: "The defendant also has a right not to testify." Ultimately, the State's comments were directed only at the theory of defendant's case and to clarify for the jury that his state of mind, not anyone else's, was the prime issue in this cause. In this, there is no error.

The next portion of the State's rebuttal closing argument that defendant cites as erroneous centered on comments the State made regarding Coronado, who drove the car from which defendant shot and later left the Spanish Cobras after this incident and joined the military. The State told the jury:

> "And make no mistake about it, Manny Coronado, no matter what he did in his life before that day *** and no matter what he will do in his life -- and apparently he is doing a lot with his life -- when he decided to come forward and changed his mind because it was the right thing to do, that may have been his finest hour. That was an act of courage, and it may seem like a tiny act of courage next to the other acts of courage he has exhibited in enlisting and working his way up to being a sergeant in the Marines --
>
> ***
>
> -- but that act of courage -- those acts of courage on a daily basis add up to a community that can protect its citizens and that's what we are here for, ladies and gentlemen."

Defendant asserts that these comments improperly bolstered Coronado's credibility and created an unfair advantage for the State. However, after reviewing defendant's own closing argument,

which preceded the State's rebuttal, we note that it was defendant who highlighted Coronado's credibility and did so in a negative way. In his closing, defendant's theme was that he alone was not responsible for Miguel's death. Turning to the testimony of Labellarte and Coronado, defendant asserted that these two State witnesses were motivated by their own self-interests and did not want to be tied to the murder. Defendant attacked Coronado in particular regarding his testimony that he was not afraid during the car chase. Defendant repeatedly told the jury that Coronado "pretend[ed]" on the stand when he testified he was not scared, thus calling his truthfulness into question. The cited comments by the State here were clearly in response to defendant's tactics. Moreover, the comments immediately preceding these included the State discussing how difficult it was for Coronado (and Labellarte), who was much younger than defendant, to testify in front of him, considering the fact that they had been in the same gang. Thus, we find nothing improper in the State's attempt here at repairing the credibility of one of its prime witnesses after it was attacked first by defendant.

Third, defendant insists that the State improperly intended to inflame the passions of the jury with the following statement:

> "In that one brief moment where [defendant] chose to make his world collide with this victim's, he shattered that victim's world and the world of all of the other people out there with this victim and all of the people in the neighborhood. And actually, all of the law-abiding citizens in the State of Illinois and in the country of the United States.
>
> And in that one moment, the world of baseball and brothers turned into a

33

world of funerals and mourning and crying because of this defendant's deliberate, conscious actions."

When examining the evidence presented at trial, we find these comments proper because they were grounded directly in that evidence. Miguel was killed shortly after playing baseball on a summer evening with his little brother; his older brother saw events leading up to his death and both he and Miguel's younger brother, along with a neighborhood crowd, saw Miguel lying dead on the sidewalk. These are facts that were never disputed. As the State points out, its comments regarding the citizens of Illinois and the United States merely urged the jury to consider the "evil results of" the crime and its "fearless administration of [justice]," which was proper in light of the totality of the evidence presented here. People v. Harris, 129 Ill. 2d 123, 159 (1989).

Defendant's fourth and final citation of error in the State's rebuttal closing argument is that the following comments were not based in the evidence presented and were personally disparaging:

"I want to leave you with one thing *** look at the one person in the lineup photo who cannot look the cameraman in the eye. Who is that person? It is the defendant. He can't look the cameraman in the eye because he knows he did something wrong.

***

And what shows in this photo – think about his nickname, Mousey – because what it shows in this photo, this man still can't accept responsibility. Mousey connotes coward, and gangs are cowards."

34

As a threshold matter, we note that defendant has waived any argument regarding these comments because he did not refer to them in his posttrial motion. See Cloutier, 156 Ill. 2d at 507 (requiring objection and posttrial motion raising issue to preserve it for review); see also Flax, 255 Ill. App. 3d at 108 (the allegedly prejudicial and inflammatory remarks must be raised with factual detail in order to preserve issue).

Defendant urges us to review his waived claim here under a plain error analysis. However, we may invoke this only in two limited instances: where the evidence presented is closely balanced, or where the alleged error is "of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial." People v. Wembley, 342 Ill. App. 3d 129, 138 (2003), relying on People v. Vargas, 174 Ill. 2d 355, 363 (1996); see People v. Keene, 169 Ill. 2d 1, 18 (1995). In particular, in order to apply this doctrine to comments made at trial, these comments must have been " 'so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten [the] deterioration of the judicial process.' " People v. Phillips, 127 Ill. 2d 499, 524 (1989), quoting People v. Albanese, 104 Ill. 2d 504, 518 (1984). We find that neither circumstance is present in the instant case. First, we have already discussed at length the overwhelming evidence presented against defendant at trial. Second, we do not conclude that the cited comments created a substantial risk of an unfair trial. As we will discuss with more specificity below, the circumstances present in the record indicate that the comments, if error at all, were only harmless; they were based on the evidence and were directly in response to defendant's statements during his own closing argument, and ultimately, the trial court clearly instructed the jury that unsupported statements must be ignored and that closing arguments do

35

not constitute evidence. See People v. Macri, 185 Ill. 2d 1, 52 (1998) (trial court instruction cures error in State's closing argument).

Even were we to review defendant's contentions about these particular remarks the State made in its rebuttal closing argument about the lineup photograph and his nickname, we do not find that reversal of his conviction and remand are warranted. Defendant's assertion that "[n]ot a scintilla of evidence was adduced at trial" regarding this information is wholly inaccurate. To the contrary, these were facts in evidence. First, the photograph discussed here was introduced into evidence and given to the jury to examine; it was from this photograph that witness Kirkland identified defendant as the shooter. Upon our own examination of the photograph, it is obvious that defendant is the only member of the lineup who is not looking at the cameraman; this cannot be disputed. Also, defendant urged the jury during his closing argument to examine his demeanor in his videotaped confession, and discussed that he was upset and crying, indicating remorse, lack of intent and that this was not "an act." That the State countered by urging the jury to examine defendant's demeanor in this photograph and by interpreting what it signified in its view was, therefore, proper. Second, defendant's gang nickname was elicited early on at trial. That is, the testimony made clear that defendant was known to everyone in the neighborhood as "Mousey." In fact, some witnesses referred to him as such throughout their testimonies. Much was made at trial about gang involvement and hierarchy; defendant's nickname was obviously relevant. Moreover, as noted earlier, in his closing argument, defendant insisted that he alone was not responsible for Miguel's death and that he simply "exercised poor judgment." These were points the State was discussing when it made these comments.

No. 1-05-2805

We note for the record that defendant makes one final cursory argument in his brief on appeal, namely, that even if we were to decide that each contested comment alone is not sufficient to merit a new trial, their cumulative impact surely mandates this. While we recognize that there must be a point where the combination of harmless error becomes so harmful that reversal of the conviction is warranted, we find, however, that based on the record here, which we have thoroughly analyzed, the instant case does not present such a situation. See Robinson, 254 Ill. App. 3d at 921; see also, *e.g.*, People v. Moore, 358 Ill. App. 3d 683 (2005) (objection logged by the defendant and instruction issued to jury by trial court cured any prejudice arising from State's comment in closing argument).

Therefore, we conclude that the State presented a proper rebuttal closing argument and we find no reversible error present in any of the comments cited by defendant on appeal.

CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ., concur.

No. 1-05-2805

Please use the following form

The People of the State of Illinois,

                Plaintiff-Appellee,

v.

Miguel Figueroa,

                Defendant-Appellant.

---

Docket No.

COURT
Opinion
Filed

No.   1-05-2805

Appellate Court of Illinois
First District, <u>FIFTH</u> Division

March 28, 2008
(Give month, day and year)

---

JUSTICES

PRESIDING JUSTICE JAMES FITZGERALD SMITH DELIVERED THE OPINION OF THE COURT:

GALLAGHER and O'MARA FROSSARD, JJ., concur.

---

APPEAL from the Circuit Court of Cook County; the Hon_____ Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County.

The Hon. FRED G. SURIA, Judge presiding.

---

FOR APPELLANTS
John Doe, of Chicago

For APPELLEES, :

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word r NONE if not represented.

APPELLANT: OFFICE OF THE STATE APPELLATE DEFENDER, Chicago, IL Michael J. Pelletier, Deputy Defender; Maria A. Harrigan, Assistant Appellate Defender

---

Smith and Smith of Chicago,

APPELLEE: OFFICE OF THE ILLINOIS STATE'S ATTORNEY, Chicago, IL Richard A. Devine, State's Attorney; James E. Fitzgerald, Ashley Romito, Michelle Katz, Ljubica D. Popovic, Assistant State's Attorneys

---

(Joseph Brown, of counsel) Add attorneys for third-party appellants and/or appellees.

38