THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES McGEE, Defendant-Appellant.

First District (6th Division)   No. 1—02—1601

Opinion filed October 17, 2003.—Rehearing denied December 16, 2003.—Modified opinion filed December 19, 2003.

Michael J. Pelletier and David W. Gleicher, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, John E. Nowak, and Michael Chmelar, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a bench trial the defendant, James McGee, was convicted of first degree murder, aggravated battery with a firearm, two counts of aggravated discharge of a firearm, and mob action. He was sentenced to concurrent prison terms of 50 years for murder, 20 years for aggravated battery, 15 years for each aggravated discharge count, and 4 years for mob action. McGee appeals his convictions contending that the trial court erred in (1) finding him guilty of murder when he was acting in self-defense; (2) finding him guilty of felony murder when the predicate felony was aggravated discharge of a firearm; and (3) failing to conduct a preliminary investigation into his claim of ineffective assistance of counsel. For the foregoing reasons, we affirm the convictions.

## FACTS

On September 18, 1997, the defendant went to David Brown's house in the afternoon and picked him up. Five or six days earlier, Brown had been involved in an altercation with rival gang members. Brown was a member of the Mafia Insane street gang and was working security for a drug spot at the corner of Drake Street and Chicago Avenue in Chicago. The defendant was also a member of the Mafia Insane and was Brown's boss. The drug spot at Drake and Chicago was approximately one block away from a drug spot run by the Conservative Vice Lords street gang and Donnyal Thomas. While Brown rode his bike up and down Chicago Avenue, he became involved in an altercation with Thomas and other members of the Conservative Vice Lords. During the fight, Thomas and three other Conservative Vice Lords beat up Brown. The fight ended when someone yelled that the police were coming. After the fight, the defendant drove Brown home.

Brown testified for the State that on September 18, 1997, the defendant picked up Brown at Brown's house in the afternoon. They were going to a liquor store and the defendant was driving and Brown was in the front passenger seat. The defendant stopped at a stop sign

at the corner of Lawndale and Chicago Avenues in Chicago. At trial, Brown testified that he and the defendant were not driving around looking for Thomas or any other Conservative Vice Lords. He also testified that he did not have a gun and he did not know the defendant was carrying a gun.

Brown was impeached with a written statement he had given to police in June 1998. In the statement, Brown stated that while he was in the car with the defendant, the defendant asked about Brown's eye, which had been swollen from the fight. Brown stated that the defendant told him not to worry about it because the defendant would take care of it. Brown took that statement to mean that the defendant would shoot any of the Conservative Vice Lords who had beaten Brown the previous week. Brown further stated that he knew the defendant had a gun and that they drove by the Conservative Vice Lords' drug spot. Brown stated that while they were driving around, they saw some fellow Mafia Insane members and that the defendant asked them if they had seen Thomas or any of Thomas' "guys" around. Brown also admitted that he had a gun.

At approximately 6:30 p.m. on September 18, 1997, Ashley Brown, Sarah Young, and Young's 18-month-old son Maurice Hodges went to a store at Central Park and Chicago Avenue. While at the store, Ashley and Sarah met Keith Tiggs and Thomas. After leaving the store, the group walked west on Chicago Avenue toward another convenient store, located at Lawndale and Chicago Avenues. Sarah was pushing Maurice in a stroller. Halfway to the store, Ashley noticed Thomas was walking behind the group. Then, Thomas came running up to the group, shouting "move, move, back, back, back." Thomas lifted his shirt and pulled a gun from his waistband and started firing at the defendant's car, which was stopped at the corner of Lawndale and Chicago Avenues.

Brown testified that he was "laying back" in the passenger seat when the defendant told him to look out. Brown looked out the window and saw Thomas running toward the car from 25 to 30 feet away. Thomas had a gun pointed at the car. Brown testified that the defendant pulled out his gun. Thomas shot first and the defendant immediately returned fire. Brown testified that the defendant shot three times at Thomas from inside the car and then got out of the car and fired two more shots at Thomas. Brown testified that when the defendant got out of the car, Thomas was running away and the defendant shot two more times. Then, the defendant was out of bullets. The defendant got back in the car and drove to Brown's house.

As the defendant and Brown drove away, Brown saw Sarah sitting on the ground with her hands on the stroller. When the defendant and

Brown returned to Brown's house, Brown found out that the baby had been shot and he told the defendant. The defendant placed his gun on Brown's dresser and left.

On September 26, 1997, Brown was arrested while in possession of the defendant's gun. It was determined that the bullet recovered from Sarah's leg was fired from the defendant's gun. This same bullet had killed 18-month-old Maurice Hodges. On June 10, 1998, Brown gave his written statement to the police. One month later the defendant was arrested in Arkansas.

At the close of the State's case, the defendant moved for a directed finding of not guilty based, in part, on a theory of self-defense. The court denied that motion. The defense rested without calling any witnesses. The court found the defendant guilty of felony murder based on aggravated discharge of a weapon, felony murder based on mob action, aggravated battery with a firearm as to Sarah Young, aggravated discharge as to both Ashley Brown and Keith Tiggs, and mob action. The defendant appeals his convictions.

## I. SELF-DEFENSE

Defendant argues that the trial court erred in finding him guilty as the evidence shows he was acting in self-defense. The defendant was found guilty of felony murder based on the predicate offense of aggravated discharge of a firearm. The State, citing numerous cases, maintains that the defendant's self-defense argument is not available because the defendant was found guilty under the felony murder statute. The defendant argues that his self-defense claim is a defense to the aggravated discharge of a firearm charge. Defendant contends that he is not guilty of aggravated discharge of a firearm, the underlying predicate felony, and thus is not guilty of felony murder. We need not address this issue as we find that the trier of fact properly rejected the defendant's claim of self-defense.

■ We review the decision of the trial court looking at the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found, beyond a reasonable doubt, that the defendant did not act in self-defense. *People v. Young*, 323 Ill. App. 3d 1078, 1089, 753 N.E.2d 1046 (2001). The defendant maintains that the evidence clearly establishes that Thomas shot first at the defendant's car and the defendant merely acted in self-defense by shooting back. The defendant further points out that the evidence shows that once Thomas stopped shooting, the defendant also stopped and drove off. The State, however, contends that the defendant was the aggressor and further that the force used was not necessary to avert the danger.

The record establishes that the defendant's fellow gang member, Brown, had been beaten up by Thomas and other members of Thomas' gang. Several days after Brown was beaten, the defendant went to Brown's house and the two of them went out for a drive. While they were driving, the defendant told Brown not to worry about getting beaten because he, the defendant, would take care of it. Brown took this statement to mean that the defendant would shoot Thomas or any of the others involved in beating Brown. Both the defendant and Brown were carrying guns. The defendant drove by the corner where Thomas' gang sold drugs; however, no one was there. Then the defendant pulled over to ask other fellow gang members whether they had seen Thomas. As the defendant was stopped at a stop sign, he saw Thomas running toward his car with a gun pointed at the car. The defendant drew his gun, and as Thomas started firing, the defendant returned fire immediately. The defendant shot at Thomas three times while sitting in the car and twice more after getting out of the car. The defendant stopped shooting when he ran out of bullets.

■ We find that the trier of fact could reasonably find that defendant was not acting in self-defense when he discharged his firearm. In looking at this evidence in the light most favorable to the State, the defendant was driving around looking for Thomas and the other Conservative Vice Lords who had beaten up Brown. The defendant was carrying a gun. When the defendant saw Thomas approaching the car with a gun, the defendant did not drive away. Instead, the defendant pulled his gun out and immediately shot back. Then, rather than drive away, the defendant got out of the car and continued shooting at Thomas. Thomas may have fired the first shot, but as Brown testified, the defendant shot back immediately so that it sounded like one gun being fired. A rational trier of fact could find that the defendant was in fact looking for the opportunity to shoot Thomas and that he did not fire his gun in self-defense but, rather, was just as much the aggressor as was Thomas.

## II. FELONY MURDER BASED UPON AGGRAVATED DISCHARGE

■ Next the defendant contends that aggravated discharge of a firearm is an act inherent in the act of murder itself and thus cannot be used as a predicate offense for felony murder. Defendant cites *People v. Morgan*, 197 Ill. 2d 404, 447-48, 758 N.E.2d 813 (2001), for support. In light of the recent Illinois Supreme Court decision in *People v. Pelt*, 207 Ill. 2d 434 (2003), filed on the same day as our original disposition in this case, we have reexamined this issue and for the reasons that follow, we have reached the same conclusion.

We find that the case at bar can be distinguished from both *Pelt* and *Morgan*. In *Pelt*, the defendant was found guilty of aggravated battery of a child, his infant son, and first degree felony murder predicated on aggravated battery of a child. The evidence showed that the defendant threw the infant into a dresser, causing injuries that led to the infant's death. The Illinois Supreme Court held that aggravated battery improperly served as the predicate for felony murder. *Pelt*, 207 Ill. 2d at 440. Following the same analysis it made in *Morgan*, the court focused on whether the "defendant's aggravated battery was an act that was inherent in, and arose out of, the killing of the infant." *Pelt*, 207 Ill. 2d at 442. The court found that the act of throwing the infant formed the basis of the aggravated battery conviction and it was also the same act underlying the killing. *Pelt*, 207 Ill. 2d at 442. Thus, the court reasoned that it could not conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct that killed the infant. *Pelt*, 207 Ill. 2d at 442.

Following the analysis of the Illinois Supreme Court in *Pelt*, the question we must answer is whether the defendant's aggravated discharge of a firearm was an act that was inherent in, and arose out of, the killing of Maurice Hodges. If the murder gave rise to the forcible felony, then the forcible felony cannot serve as a predicate felony for felony murder. *Morgan*, 197 Ill. 2d at 446-47. Unlike *Morgan* and *Pelt*, the cause and effect relationship here between aggravated discharge of a firearm and the killing is not muddled. Here, the defendant shooting at rival gang member Thomas is the conduct that formed the basis of defendant's aggravated discharge of a firearm conviction. The defendant shooting Maurice Hodges is the conduct that formed the basis for murder. Thus, it is not difficult here to conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct that killed the baby.

Here the facts are almost identical to the facts in *People v. Toney*, 337 Ill. App. 3d 122, 785 N.E.2d 138 (2003). The *Toney* court found that the facts did not support the conclusion that the acts constituting the forcible felony of aggravated discharge of a firearm arose from and were inherent in the act of murder itself. See *People v. Toney*, 337 Ill. App. 3d at 135. For the same reasons the *Toney* court distinguished *Morgan*, we too can distinguish *Morgan* and *Pelt*. Unlike *Morgan* and *Pelt*, where the murders gave rise to the predicate felonies, in the instant case, the murder of Maurice Hodges did not give rise to the predicate felony of aggravated discharge of a firearm. As this court explained in *Toney*, the factual context is critical in determining

whether the forcible felony can serve as a predicate felony for felony murder. As in *Toney*, there is sufficient evidence that the acts constituting the predicate felony of discharge of a firearm did not arise from and were not inherent in the murder of Maurice Hodges but, rather, involved conduct with an independent felonious purpose other than the killing of Hodges. That conduct involved the independent felonious purpose of discharging a firearm at a rival gang member, Thomas, eventually resulting in the death of Maurice Hodges.

We find, based on the facts of this case, the act of discharging a firearm can serve as the predicate felony for felony murder.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, the defendant contends that the trial court erred by failing to conduct a preliminary investigation of his claims of ineffective assistance of counsel. The defendant was represented by private counsel of his own choosing. After trial, the defendant filed a *pro se* motion alleging numerous claims of ineffective assistance of counsel. The record indicates that when defense counsel was informed of the motion, he asked the court for time to review the allegations. Thereafter, defense counsel requested additional time to discuss defendant's motion with the defendant. After consulting with his counsel on several occasions regarding these claims, the defendant withdrew his motion.

The defendant contends that the court had a duty to conduct an independent inquiry into the allegations and into the withdrawal of the motion. Defendant maintains that once the court was put on notice of such allegations, it had a duty to make a preliminary inquiry into the validity of those allegations. Defendant asserts the fact that the motion was withdrawn is irrelevant and implies that he was pressured into withdrawing the motion by his counsel. We disagree.

■ In this case, the defendant retained private counsel of his own choosing. Defendant was free to retain different counsel to represent him prior to the hearing on his *pro se* motion. See *People v. Pecoraro*, 144 Ill. 2d 1, 15, 578 N.E.2d 942 (1991). As the court in *Pecoraro* stated, "It was not within the trial court's rubric of authority to advise or exercise any influence or control over the selection of counsel by defendant, who was able to, and did, choose counsel on his own accord. [Citation.]" *Pecoraro*, 144 Ill. 2d at 15. Similarly, here, the defendant retained private counsel of his own choosing. The defendant was in a position to end that attorney-client relationship and obtain new counsel if he so chose. Instead, the defendant withdrew his motion and effectively prevented the trial court from any substantive review of his motion.

700

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

GALLAGHER and SMITH, JJ., concur.