2020 IL App (4th) 180343

FILED
November 4, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| JAMES T. SHAFER, | ) | No. 16CF239 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brien J. O'Brien, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices DeArmond and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1        A jury found defendant, James T. Shafer, guilty of felony murder (720 ILCS 5/9-1(a)(3) (West 2016)), second degree murder (*id.* § 9-2(a)(2)), unlawful possession of a firearm by a felon (*id.* § 24-1.1(a)), and aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). The circuit court of Coles County sentenced him to 53 years' imprisonment for felony murder and a concurrent term of 14 years' imprisonment for unlawful possession of a firearm by a felon.

¶ 2        Shafer appeals on three grounds. First, he contends that the conviction of felony murder must be reversed for lack of a predicate offense. Second, he contends that the circuit court violated his right to due process by failing to follow Illinois Supreme Court Rule 430 (eff. July 1, 2010) before requiring him to wear an electric stun cuff during the jury trial. Third, he alleges sentencing errors. We agree with the first and second of those contentions, but we find the due-process violation in the noncompliance with Rule 430 to be harmless beyond a reasonable

doubt. Because the reversal of the felony-murder conviction necessitates resentencing, we do not reach the sentencing issues in the third contention. Therefore, we reverse the felony-murder conviction, affirm the remaining convictions, and remand this case for resentencing.

¶ 3                                 I. BACKGROUND

¶ 4                                 A. The Charges

¶ 5        The State charged Shafer with five offenses: count I, intentional murder (720 ILCS 5/9-1(a)(1) (West 2016)); count II, strong-probability murder (*id.* § 9-1(a)(2)); count III, felony murder (*id.* § 9-1(a)(3)) premised on the aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)); count IV, unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)); and count V, aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)).

¶ 6                      B. The Pretrial Ruling on the Stun Cuff

¶ 7        Immediately before jury selection, the circuit court addressed the question of whether an electric stun cuff that was on Shafer's right ankle, under his clothing, should be removed before the trial. The court asked:

"And Deputy Kastl, is it on his leg right now?

DEPUTY KASTL: Yes, sir.

THE COURT: All right. I am going to go ahead and come down there, Mr. Shafer, and just take a look to see what observations I can make about it. It is on your right leg?

DEFENDANT SHAFER: Yeah.

THE COURT: All right. Okay. I don't want to be intrusive here, Mr. Shafer, but I am just going to take a look at it.

DEPUTY KASTL: Your Honor, may I? If I can make an adjustment, sir?

- 2 -

THE COURT: Yes, sir. Okay. If you'd just sit with your leg, how you would normally sit. I don't know how you are comfortable, Mr. Shafer. Do you typically—I assume you are not going to sit with your leg crossed.

DEFENDANT SHAFER: No.

THE COURT: So—

DEFENDANT SHAFER: Should be fine.

THE COURT: Okay. It doesn't appear to me that it would protrude from the pant leg, as long as Mr. Shafer doesn't cross his legs or anything like that. So, Mr. Ortega, I will let you further address the issue if you'd like to.

MR. ORTEGA: My biggest concern is just when we are entering into the courtroom; but just show our continuing objection, Judge.

THE COURT: Okay. Well, after getting a look at it, I think I am going to—or I am deciding that the stun cuff will be worn during the trial. I don't think it would be visible to the prospective jurors.

MR. ORTEGA: Judge, could my client be unshackled then?

THE COURT: Yes. Yes, he can."

¶ 8                           C. The Evidence in the Jury Trial

¶ 9          The evidence in the jury trial tended to show the following. Shafer became aware that three men who were acquaintances of his were out looking for him. He feared they intended to do him harm. To get away from this perceived threat, Shafer and his girlfriend, Ciara Faires, planned to take a bus to Texas. They were at a friend's house, making preparations for the trip, when Shafer and Faires got into a dispute. Shafer pushed Faires outside the residence and locked the door. Soon, there was a knock at the door. Shafer looked out a window and saw one of the men

whom he feared. The man was standing next to a car, with Faires close by. Another man popped up just outside a window, and Shafer heard a gunshot. Shafer picked up a pistol and fired twice through the wooden front door of the apartment. He testified he had intended to shoot the man who was outside menacing him with a gun. Instead, one of the rounds, going through the door near the lock, struck Faires, fatally wounding her. Shafer told the police and his mother that he had shot at the front door in an attempt to frighten away the men who were outside the apartment.

¶ 10                                            D. The Verdicts

¶ 11            The jury returned verdicts finding Shafer guilty of felony murder, two counts of second degree murder, aggravated discharge of a firearm, and unlawful possession of a firearm by a felon. The jury reduced counts I and II, which charged Shafer with first degree murder, to second degree murder, finding the mitigating factor of unreasonable self-defense (see *id.* § 9-2(a)(2)).

¶ 12                                            E. The Sentences

¶ 13            The circuit court sentenced Shafer to 53 years' imprisonment for count III, felony murder, and a concurrent term of 14 years' imprisonment for count IV, unlawful possession of a firearm by a felon.

¶ 14            This appeal followed.

¶ 15                                            II. ANALYSIS

¶ 16                    A. Felony Murder Without a Genuine Predicate Felony

¶ 17            Under section 9-1(a) of the Criminal Code of 2012 (Code) (*id.* § 9-1(a)), there are three kinds of first degree murder: intentional murder (*id.* § 9-1(a)(1)), strong-probability murder (*id.* § 9-1(a)(2)), and felony murder (*id.* § 9-1(a)(3)). Section 9-1(a) provides as follows:

                "(a) A person who kills an individual without lawful justification commits

                first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." *Id.* § 9-1(a).

¶ 18 Second degree murder is intentional first degree murder (*id.* § 9-1(a)(1)) or strong-probability first degree murder (*id.* § 9-1(a)(2)) that is attended by either of two mitigating factors:

"(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder *** and either of the following mitigating factors are [*sic*] present:

(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender intends to kill, but he or she negligently or accidentally causes the death of the individual killed; or

(2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [(720 ILCS 5/art. VII (West 2016))], but his or her belief is unreasonable." 720 ILCS 5/9-2(a) (West 2016).

¶ 19    Second degree murder—and, therefore, intentional or strong-probability murder (which, being mitigated, is what second degree murder is (*id.* § 9-2(a))—cannot serve as a predicate for felony murder. See *id.* § 9-1(a)(3). That is, it is impossible to commit felony murder by committing second degree murder. Accordingly, second degree murder should not be dressed up as felony murder.

¶ 20    On appeal, Shafer objects that the felony murder charge, count III, was nothing but a device to nullify a second degree murder conviction. Felony murder entails the commission of a predicate offense—which, again, must be a violent felony other than second degree murder. *Id.* The perpetrator of a forcible felony, or predicate offense, is criminally liable for felony murder if the forcible felony foreseeably causes someone's death. *People v. Nash*, 2012 IL App (1st) 093233, ¶ 27. It is true that the aggravated discharge in this case—firing the pistol through the door of the apartment—foreseeably caused Faires's death, meaning it was reasonably foreseeable that such an act could result in someone's getting killed. Nevertheless, Shafer contends that, under the facts of his case, his aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016))—*which was nothing but the means by which he committed second degree murder*—cannot serve as a predicate offense for felony murder (*id.* § 9-1(a)(3)) and, therefore, the State failed to prove him guilty of felony murder.

¶ 21    Shafer does not go so far as to suggest that aggravated discharge of a firearm can *never* serve as a predicate offense of felony murder. He notes that it did so in *People v. Boyd*, 356 Ill. App. 3d 254, 261 (2005), for instance. But he contends that, under the facts of his own case, aggravated discharge of a firearm was not a valid predicate offense. The reason, he explains, is that instead of setting in motion a series of events that later caused Faires's death (see *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 43), his aggravated discharge of a firearm was an act

- 6 -

"inherent in the act of murder itself," lacking "an independent felonious purpose" (internal quotation marks omitted) (*People v. Davison*, 236 Ill. 2d 232, 240 (2010)). His firing of the pistol had no felonious purpose other than the commission of second degree murder, an offense of which the jury found him guilty. Second degree murder cannot be the predicate of felony murder. 720 ILCS 5/9-1(a)(3) (West 2016). To prove Shafer guilty of felony murder, the State had to prove that, "in performing the acts which cause[d]" Faires's "death," he was "attempting or committing a forcible felony *other than second degree murder*." (Emphasis added.) 720 ILCS 5/9-1(a)(3) (West 2016). By the aggravated discharge of a firearm, he committed second degree murder, as the jury found: he committed an offense that, by definition, was motivated by the intent to kill. It was not that he committed a felony lacking an intent to kill that then nevertheless resulted in Faires's death. Given the finding of an intent to kill, this case could not have come out of the felony-murder mold. Therefore, Shafer reasons, he did *not* commit felony murder any more than the defendant in *O'Neal* did so.

¶ 22        In *O'Neal*, the defendant Jauan O'Neal, fired a pistol at an approaching van, believing it to be occupied by members of a rival street gang who planned to attack a group of people having a street party. *O'Neal*, 2016 IL App (1st) 132284, ¶ 1. O'Neal's friend, Darius Murphy, was sitting in a car across the street, and one of the rounds from O'Neal's pistol went astray, killing Murphy. *Id.*

¶ 23        The jury found O'Neal guilty of intentional murder (720 ILCS 5/9-1(a)(1) (West 2010)) and strong-probability murder (*id.* § 9-1(a)(2)), but the jury reduced those murder convictions to second degree murder, finding that O'Neal had, at the time, a genuine though unreasonable belief that he needed to open fire in defense of himself and others (see *id.* §§ 7-1(a), 9-2(a)(2)). *O'Neal*, 2016 IL App (1st) 132284, ¶ 3. Simultaneously, the jury found O'Neal guilty

of first degree murder on a theory of felony murder (720 ILCS 5/9-1(a)(3) (West 2010)). *O'Neal*, 2016 IL App (1st) 132284, ¶ 26. Also, the jury found him guilty of the supposed predicate offense, aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)). *O'Neal*, 2016 IL App (1st) 132284, ¶ 26.

¶ 24　　　　On appeal, O'Neal argued "that, in this case, aggravated discharge of a firearm could not be used as the predicate felony for his felony murder conviction because it was inherent in the act causing Murphy's death." *Id.* ¶ 28. In evaluating that argument, the appellate court posed "two separate questions": (1) "whether [O'Neal's] act of shooting at the van was inherent in the death of Darius Murphy, such that permitting a felony-murder charge would allow the State to circumvent the second-degree murder statute" and (2) "whether [O'Neal's] felonious purpose in discharging the firearm was independent of the murder itself." *Id.* ¶ 40. By the appellate court's understanding of supreme court case law, if O'Neal prevailed on either of those questions, the felony-murder conviction should be reversed. *Id.* (It seems to us, though, that the two questions blur together in *People v. Pelt*, 207 Ill. 2d 434, 441 (2003).) The appellate court concluded that O'Neal prevailed on both questions. *O'Neal*, 2016 IL App (1st) 132284, ¶ 26.

¶ 25　　　　First, the predicate felony, aggravated discharge, was inherent in the murder because "[p]roof of the predicate felony and proof of the murder were one and the same." *Id.* ¶ 48. It was not that O'Neal completed the predicate felony which then set in motion a succession of events that ended with Murphy's death (*id.* ¶ 47)—as in *People v. Toney*, 337 Ill. App. 3d 122 (2003), for example, in which the defendants opened fire on a rival street gang and the rival street gang returned fire, striking and killing a bystander (*O'Neal*, 2016 IL App (1st) 132284, ¶ 44). Rather, O'Neal's "act was the *only* event, the direct and only cause of Murphy's death." (Emphasis in original.) *Id.* ¶ 47. And the jury had found this act to be second degree murder. *Id.* ¶ 50. "[A]

- 8 -

felony-murder charge," however, "allowed the State to effectively nullify a second-degree murder verdict where it otherwise should have been available." *Id.*

¶ 26 Second, the appellate court considered whether O'Neal had "acted with a felonious purpose that was independent of the murder itself." *Id.* ¶ 57. O'Neal's felonious purpose in firing the fatal round "could [not have] somehow change[d] based on where the [round] happened to land, regardless of whether it landed with the intended target or the unintended bystander." *Id.* ¶ 58. It was not that a shooter had one felonious purpose if the round hit the intended victim and a different felonious purpose if the round missed the intended victim and hit someone else. Rather, under the principle of transferred intent, O'Neal's "intent—his felonious purpose—in shooting the unintended victim [was] one and the same as his intent to kill the intended victim." *Id.* ¶ 59. If O'Neal intended to shoot to death the members of a rival street gang but he missed and killed Murphy instead, O'Neal was "deemed to have intended to kill the innocent bystander," Murphy. *Id.* Thus, in shooting at the van and missing, O'Neal did not act with a felonious purpose that was independent of his purpose to kill: it was all the same intent to kill, not one intent directed at the rival gang and another intent directed somehow at Murphy. *Id.* ¶ 63. There was no independent felonious purpose. There was no extrinsic act. The State failed to prevail on both of the crucial questions. Therefore, the appellate court in *O'Neal* reversed the felony-murder conviction and remanded the case for resentencing. *Id.* ¶ 4.

¶ 27 Shafer contends that the two questions in *O'Neal* should be answered in his favor for the same reasons they were answered in O'Neal's favor and that the same disposition should follow.

¶ 28 In response, the State does not so much as mention *O'Neal*. But the State cites other decisions by the appellate court—decisions which, as the State puts it, "have found both of these

issues"—the extrinsic act and the independent felonious purpose—to be "satisfied in support of a finding of felony murder in cases like this one, involving the killing of innocent bystanders."

¶ 29　　　　The first case that the State cites is *People v. Figueroa*, 381 Ill. App. 3d 828 (2008). In that case, the defendant, Miguel Figueroa, was a passenger in a car chase. The car in which Figueroa was riding was being pursued by vehicles driven by Charles Ellison and Wilson Torres, members of a rival street gang. *Id.* at 831. Figueroa stood up through the sunroof of the car in which he was riding and, with a pistol, fired shots at the pursuing vehicles. *Id.* One of the rounds that Figueroa fired missed the pursuing vehicles and killed 12-year-old Miguel De La Rosa (*id.* at 830), who was outside playing baseball with his brother (*id.* at 833). A jury found Figueroa guilty of knowing and intentional murder as well as felony murder (*id.* at 830) based on the aggravated discharge of a firearm (*id.* at 834).

¶ 30　　　　On appeal, Figueroa contended that "the aggravated discharge was inherent in the act of murder here and, thus, could not be a predicate offense for a felony murder charge." *Id.* The First District disagreed. It reasoned that, because Figueroa had the felonious purpose of killing Ellison and Torres instead of killing De La Rosa, Figueroa had an independent felonious purpose and his aggravated discharge of a firearm was not an act inherent in De La Rosa's murder. *Id.* at 836. His purpose was to kill Ellison and Torres, which was independent of any purpose to fire in the direction of Miguel De La Rosa:

> "[Figueroa's] conduct of shooting his gun through the sunroof at Ellison's car and Torres'[s] van was not an act that was inherent in or arose out of the killing of Miguel. That is, the aggravated discharge was not inherent in the murder of Miguel but, rather, involved conduct with a felonious purpose *other* than killing Miguel, namely, shooting at Ellison and Torres, both of whom were nowhere near Miguel

at the time. \*\*\* [Figueroa's] shooting at Ellison and Torres is the conduct which formed the basis of the aggravated discharge of a firearm charge; his separate shooting (and hitting) of Miguel is the conduct which formed the basis of the murder.

At their core, the facts here comprise a gang shooting resulting in the death of an innocent bystander." (Emphasis in original.) *Id.* at 836.

¶ 31        In *O'Neal*, the First District was uncertain how to understand that passage in *Figueroa*. *O'Neal*, 2016 IL App (1st) 132284, ¶ 71. The passage could be interpreted as meaning that Figueroa fired some shots at Ellison and Torres (the aggravated discharge) and fired other shots not at them but at De La Rosa (the intentional and knowing murder). The First District in *O'Neal* found that, if this interpretation of *Figueroa* were correct, the case was distinguishable (*id.* ¶ 71)—in addition to being distinguishable because, in *Figueroa*, the jury did not return a verdict of second degree murder, as it did in *O'Neal* (*id.* ¶ 67). O'Neal was shooting at the van when he missed and hit Murphy; it was not that he shot at the van and shot separately at Murphy.

¶ 32        If, on the other hand, the First District in *Figueroa* meant that, by missing Ellison and Torres and hitting De La Rosa, Figueroa had committed an act that was extrinsic to the murder of De La Rosa, the First District in *O'Neal* disagreed: "It was all the same conduct—discharging a firearm in the direction of a rival gang member. The fact that all of the bullets missed the gang members, and one of them hit an innocent bystander, does not change the fact that the physical act was the same." *Id.* ¶ 71.

¶ 33        We likewise find the analysis in *Figueroa* to be ambiguous. But insomuch as *Figueroa* holds that firing a shot that misses the intended victim and kills a bystander is not an act inherent in murder, we, like the First District in *O'Neal*, are unconvinced and decline to follow

- 11 -

*Figueroa*. Instead, we follow the well-established doctrine of transferred intent, which is written into the murder statute:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
>> (1) he either intends to kill or do great bodily harm to that individual *or another*, or knows that such acts will cause death to that individual *or another*; or
>>
>> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual *or another* \*\*\*." (Emphases added.) 720 ILCS 5/9-1(a)(1), (2) (West 2016).

¶ 34    By its use of the phrase "or another," the legislature has built into the murder statute the principle of transferred intent. 720 ILCS Ann. 5/9-1, Committee Comments-1961, at 14 (Smith-Hurd 1992). "[I]f the offender has the mental state which characterizes murder, he is guilty of murder even if the person he kills is not the one whom he intended to kill." *Id.* Thus, if either through bad aim or mistaken identity, the offender kills the wrong person, the intent transfers to the victim. *People v. Shelton*, 293 Ill. App. 3d 747, 753 (1997). In other words, the offender is criminally liable for murder just as if the unintended victim were the intended victim. *Id.* In such a case, the offender cannot be said to have a felonious intent (or purpose, which is another word for intent) that is independent of committing murder. Nor can the offender be said to have performed an act that is extrinsic (as opposed to intrinsic) to the offense of murder. Rather, the offender's felonious intent and the act implementing that intent fall squarely within the terms of intentional or strong-probability murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)).

¶ 35        Granted, in a bad-aim case, the defendant had a *subjective* purpose independent of killing the unfortunate bystander. But the question is whether the defendant had an "independent *felonious* purpose." (Emphasis added.) *People v. Morgan*, 197 Ill. 2d 404, 458 (2001). The answer is no because, under the murder statute, the felonious purpose is to kill "that individual *or* another." (Emphasis added.) 720 ILCS 5/9-1(a)(1), (2) (West 2016). It is the same felonious purpose, regardless of whether the intended victim is killed or an unintended victim is killed.

¶ 36        The second case that the State cites is *People v. McGee*, 345 Ill. App. 3d 693 (2003). In that case, the defendant, James McGee, was shooting at a member of a rival street gang, Donnzal Thomas, when he missed Thomas and hit a baby in a stroller, Maurice Hodges, killing him. *Id.* at 695. McGee was convicted of (among other crimes) felony murder based on the aggravated discharge of a firearm. *Id.* at 696.

¶ 37        On appeal, McGee argued that his aggravated discharge of a firearm was an act inherent in the murder of Hodges and, thus, could not serve as a predicate offense for felony murder. *Id.* at 697. That argument—which we regard as indisputably correct—was unavailing in *McGee*. The First District reasoned as follows:

> "Here, [McGee's] shooting at rival gang member Thomas is conduct which formed the basis of [McGee's] aggravated discharge of a firearm conviction. [McGee's] shooting Maurice Hodges is the conduct which formed the basis for murder. Thus, it is not difficult here to conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct which killed the baby." *Id.* at 698.

¶ 38        The facts of the case, the First District continued in *McGee*, were "almost identical to the facts in *** *Toney*" (*id.*)—which is the third case that the State cites in the present appeal.

- 13 -

In *Toney*, the defendant, Donald Toney, drove two of his fellow Gangster Disciples, Robert Foster and Frederick Luckett, into the territory of a rival street gang, the Four Corner Hustlers. *Toney*, 337 Ill. App. 3d at 129. Foster and Luckett got out of the car and opened fire on some Four Corner Hustlers. *Id.* An all-out gun battle between the gangs ensued. *Id.* Several minutes after the initial exchange of gunfire, Phillip Matthews, at a different location, was shot dead by someone other than Foster and Luckett. (A slug from a different caliber of firearm was found in Matthews's body.) *Id.* at 135. Although Toney had fired no weapon, he was convicted of felony murder (among other offenses) on a theory of accountability because he had aided and abetted Foster and Luckett by being their driver, by driving them into Four Corner Hustlers territory with the agreed-upon plan of mounting an armed assault. *Id.* at 129.

¶ 39          Toney contended, on appeal, that the aggravated discharge of a firearm by Foster and Luckett (for which he was accountable) could not serve as a predicate felony for felony murder. *Id.* at 128. The First District disagreed. By opening fire, Luckett and Foster had "set in motion" a gun battle that foreseeably could have resulted—and did result—in someone's being killed, perhaps by return gunfire. *Id.* at 135.

¶ 40          McGee's case was just like Toney's case, according to the First District in *McGee*. *McGee*, 345 Ill. App. 3d at 698. McGee did not intend to kill Hodges any more than Toney and his associates intended to kill Matthews. Therefore, the First District in *McGee* reasoned, a different felonious purpose must have been at work in both cases:

> "As in *Toney*, there is sufficient evidence that the acts constituting the predicate felony of discharge of a firearm did not arise from and were not inherent in the murder of Maurice Hodges but, rather, involved conduct with an independent felonious purpose other than the killing of Hodges. That conduct involved the

- 14 -

independent felonious purpose of discharging a firearm at a rival gang member, Thomas, eventually resulting in the death of Maurice Hodges." *Id.* at 699.

¶ 41    On this logic in *McGee*, a transferred intent is an "independent felonious purpose." *Id.* In other words, the defendant's felonious purpose of killing "another" (to use the language of the murder statute) is different from the transferred felonious purpose of killing "that individual," whose death the defendant caused instead. 720 ILCS 5/9-1(a)(1), (2) (West 2016).

¶ 42    The First District in *O'Neal* rejected that reasoning in *McGee*. "[I]n cases involving an unintended victim," the *O'Neal* court observed, "the law treats the defendant's intent—his felonious purpose—in shooting the unintended victim as one and the same as his intent to kill the intended victim. If the defendant intended to kill an individual, he is deemed to have intended to kill the innocent bystander." *O'Neal*, 2016 IL App (1st) 132284, ¶ 59.

¶ 43    The analogy that *McGee* drew to *Toney* was unconvincing to the *O'Neal* court because, instead of being a case of transferred intent, *Toney* was a classic case of felony murder— which *McGee* was not. In *Toney*, the defendant "set in motion a gunfight in which a bullet *from someone else's gun* killed the victim." (Emphasis added.) *Id.* ¶ 66. In *McGee*, by contrast, there was no separate act with a separate felonious purpose. The defendant in *McGee* set no apparatus in motion in which a secondary gear sheared off someone's life. "To the contrary, it appears that the defendant's only act was shooting at the rival. That act *resulted* in the death of an unintended target, but the defendant's *conduct* was the same." (Emphases in original.) *Id.* ¶ 69. (Also, the First District in *O'Neal* distinguished *McGee* for the same reason that it distinguished *Figueroa*: there was no verdict or finding of second degree murder. *Id.* ¶ 67. Even so, it seems to us, there is always the concern that judicial records speak the truth. A defendant should not be convicted of a felony murder that was, as a matter of law, unproven because there was no genuine predicate.) We decline

to follow *McGee* because we have the same concerns about that case that the First District explained in *O'Neal*. Like *Figueroa*, *McGee* was a case of " 'straight[-]up murder,' " not felony murder. *Id.* ¶ 12 (quoting trial counsel's argument: " 'If I'm shooting at someone, intending to kill them, and I miss and kill the person behind him, that's straight[-]up murder. That's not felony murder.' ").

¶ 44        The fourth case that the State cites is *People v. Colbert*, 2013 IL App (1st) 112935. In *Colbert*, the defendant, Lapoleon Colbert, joined a street brawl between two rival groups of high-school students. *Id.* ¶¶ 2-3. Video recordings showed several young men, including Colbert, battering Derrion Albert. *Id.* As Albert lay motionless on the ground, Colbert kicked him in the head and stomped on his torso. *Id.* ¶ 3. Albert died from cerebral hemorrhaging caused by trauma to the head (*id.* ¶ 4)—but it was perhaps unknowable whether Colbert was the assailant who inflicted the fatal injury. Colbert's theory in the jury trial was that, although he had kicked Albert in the head, as shown on video, he was not the one who delivered the fatal blow or, at least, it was unprovable beyond a reasonable doubt that his kick was the one that had killed Albert. *Id.* ¶ 7. But the jury found Colbert guilty of felony murder predicated on mob action. *Id.*

¶ 45        On appeal, seemingly in contradiction of his theory in the trial, Colbert argued that "his felony murder conviction should be reversed because the conduct constituting the mob action was inherent in the murder itself and was therefore not committed with an independent felonious purpose." *Id.* ¶ 14. On the basis of statements that Colbert had made to detectives, however, the First District found that Colbert's participation in the mob action had "an independent felonious purpose other than the murder itself" (*id.* ¶ 15), namely, "the independent felonious purpose of physically intimidating and harassing fellow students from a rival neighborhood"—without killing anyone (*id.* ¶ 16). " 'But I ain't know it was going to be like that,' " Colbert had explained to the

- 16 -

detectives, referring evidently to Albert's death. *Id.* The purpose of the intimidation and harassment—the purpose of the mob action—"escalated to the point where [Colbert] and his codefendants struck [Albert] multiple times, causing his death." *Id.*

¶ 46    *Colbert* is distinguishable in that, in the present case, there was no escalation from a merely harassing predicate felony to the killing of Faires. Rather, the jury found that, by firing through the door, Shafer intended, from the start, to kill someone: the jury found him guilty of intentional first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and strong-probability first degree murder (*id.* § 9-1(a)(2)), findings that the jury then mitigated to second degree murder (*id.* § 9-2(a)(2)). But the mitigation in no way detracted from the finding of Shafer's intent to kill. Shafer fired through the door, intending to kill the person on the other side. That Shafer had such an intent is a judicial fact, given the guilty verdicts on counts I and II. And "the unique characteristic of felony murder is that it does not include an intent to kill." *People v. Viser*, 62 Ill. 2d 568, 582 (1975). Or, as the Fourth District put it in *Boyd*, 356 Ill. App. 3d at 259, "[w]hen the intent is to kill, there is no predicate felony; it is only when there is no intent to kill that a predicate felony is possible."

¶ 47    Notice that, in both *Viser* and *Boyd*, the reviewing courts said "intent to kill," not "intent to kill the decedent." *Viser*, 62 Ill. 2d at 582; *Boyd*, 356 Ill. App. 3d at 259. The wording is significant. The supreme court and the Fourth District left no room for felony murder in cases where the defendant intended to kill someone other than the person whom the defendant killed, as in bad-aim or mistaken-identity cases. Rather, the "intent to kill"—an unqualified phrase—negates felony murder. *Viser*, 62 Ill. 2d at 582; *Boyd*, 356 Ill. App. 3d at 259. Thus, the reasoning in *Figueroa*, 381 Ill. App. 3d at 836, and *McGee*, 345 Ill. App. 3d at 698, is irreconcilable with the stark terms of *Viser*, 62 Ill. 2d at 582, and *Boyd*, 356 Ill. App. 3d at 259. We are bound by the

- 17 -

supreme court's teaching in *Viser*. Consistently with that teaching, we follow *O'Neal* and *Boyd* over *Figueroa* and *McGee*.

¶ 48    The fifth case that the State cites is *People v. Alvarez-Garcia*, 395 Ill. App. 3d 719 (2009). In that case, the defendant, Jesus Alvarez-Garcia, fatally shot Maritza Baez while she was pregnant with Michelle Baez. *Id.* at 721. Three months after Alvarez-Garcia was indicted, Michelle Baez died from "sepsis due to prematurity resulting from her mother's gunshot wounds." *Id.* at 724. The State added to the charging instrument eight counts of felony murder for Michelle Baez's death. *Id.* at 721. The jury found Alvarez-Garcia guilty of murdering both Maritza Baez and Michelle Baez. *Id.*

¶ 49    In his appeal, Alvarez-Garcia did not challenge his conviction of murdering the mother, Maritza Baez. *Id.* at 732. For two reasons, however, he contended that the State had failed to prove him guilty of the first degree murder of the child, Michelle Baez. *Id.* at 731. First, Alvarez-Garcia argued, the State had "failed to prove that he acted with the knowledge of the pregnancy or with the specific intent to kill" Michelle Baez. *Id.* Second, Alvarez-Garcia maintained that, "because the act of shooting Maritza Baez, the mother, was the same act that led to the child's death, *** the forcible felonies of first degree murder and aggravated battery with a firearm [would not] stand as the predicate felonies for a felony-murder conviction." *Id.*

¶ 50    According to the circuit court's findings in the bench trial, Alvarez-Garcia, at the time he shot Maritza Baez, was unaware she was pregnant. *Id.* at 732. Therefore, the appellate court "[had to] determine whether Alvarez-Garcia's intent to kill Maritza Baez was transferred to Michelle Baez." *Id.* It was. If a defendant shot at one person, intending to kill that person, but in so doing killed an unintended victim, the defendant could be convicted of murdering the unintended victim. *Id.* (citing *People v. Thompson*, 313 Ill. App. 3d 510, 516 (2000)). Since the

defendant had the requisite mental state with respect to the intended victim, the law regarded the defendant as having the requisite mental state with respect to the unintended victim as well. *Alvarez-Garcia*, 395 Ill. App. 3d at 732 (citing *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992)). This principle of transferred intent was "unaffected by the fact that both the intended victim and the unintended victim [were] killed." *Id.* Because it was natural and probable that killing a pregnant woman would cause the death of the child she was carrying in her womb, Alvarez-Garcia's intent to kill Maritza Baez was transferred, by operation of law, to her unborn child, Michelle Baez. In other words, Alvarez-Garcia was regarded as having intended to kill Michelle Baez, even though, in fact, he was unaware at the time that Maritza Baez was pregnant. *Id.* This reasoning in *Alvarez-Garcia*, scrupulously backed up by citations of case law, is convincing and, indeed, unanswerable.

¶ 51       But then the appellate court went on to conclude that Alvarez-Garcia could be convicted, additionally, of the felony murder of Michelle Baez. *Id.* at 734. And, somehow, the appellate court was able to reach that conclusion even after quoting, with apparent approval, the teaching from *Boyd*: " ' "When the intent is to kill, there is no predicate felony; it is only when there is no intent to kill that a predicate felony is possible." ' " *Id.* at 733 (quoting *People v. Phillips*, 383 Ill. App. 3d 521, 539 (2008), quoting *Boyd*, 356 Ill. App. 3d at 259). Alvarez-Garcia intended to kill; *ergo*, he could not have committed felony murder. He "had the requisite mental state as to the unintended victim," Michelle Baez, "where [he] had the requisite mental state as to the intended victim," Maritza Baez. *Id*. at 732. Alvarez-Garcia was guilty of the intentional murder of Michelle Baez (720 ILCS 5/9-1(a)(1) (West 2002)), pure and simple. It was straight-up murder, not felony murder—as, presumably, the First District now would agree after deciding *O'Neal*.

¶ 52    To sum up our discussion on this point, the doctrine of transferred intent means there is only one felonious purpose, not an independent felonious purpose. In an unreasonable belief in the need for lethal self-defense, Shafer fired through the closed door, purposing or intending to kill a perceived ruffian but instead killing his girlfriend, Faires. This is a case of mistaken identity, in which Shafer's intent to kill the ruffian is "transferred," so to speak, into an intent to kill the unintended victim, Faires: he is *deemed* to have intended to kill her although he really had no such intent. See *Shelton*, 293 Ill. App. 3d at 753. The subjective purpose was different, but the felonious purpose was the same. Or it might be easier just to think of this in terms of the intentional-murder statute: Faires is the "individual" whom Shafer killed, and the ruffian is "another" whom Shafer specifically intended to kill instead. 720 ILCS 5/9-1(a)(1) (West 2016). The intentional murder of Faires was mitigated to second degree murder. "If the defendant acted in *** unreasonable self-defense in shooting at the intended target, he acted the same way with respect to the innocent bystander." *O'Neal*, 2016 IL App (1st) 132284, ¶ 59. The trouble is, the felony murder conviction swallowed up the second degree murder conviction. See *id.* ¶ 50. The felony murder conviction is a contrivance. There was, as the jury found, an intent to kill in this case (mitigated by unreasonable self-defense), and where there is an intent to kill, there is no predicate felony and, hence, no felony murder. See *Viser*, 62 Ill. 2d at 582; *Boyd*, 356 Ill. App. 3d at 259.

¶ 53        B. The Violation of Illinois Supreme Court Rule 430

¶ 54    By order of the circuit court, Shafer, during the jury trial, wore an electric stun cuff around the ankle of his right leg, beneath his clothing. Before requiring that he wear the stun cuff during the trial, the court failed to "make specific findings as to" the 10 factors in Illinois Supreme Court Rule 430 (eff. July 1, 2010). That rule provides as follows:

"Once the trial judge becomes aware of restraints, prior to allowing the defendant to appear before the jury, he or she shall conduct a separate hearing on the record to investigate the need for such restraints. At such hearing, the trial court shall consider and shall make specific findings as to:

(1) the seriousness of the present charge against the defendant;

(2) defendant's temperament and character known to the trial court either by observation or by the testimony of witnesses;

(3) defendant's age and physical attributes;

(4) defendant's past criminal record and, more particularly, whether such record contains crimes of violence;

(5) defendant's past escapes, attempted escapes, or evidence of any present plan to escape;

(6) evidence of any threats made by defendant to harm others, cause a disturbance, or to be self-destructive;

(7) evidence of any risk of mob violence or of attempted revenge by others;

(8) evidence of any possibility of any attempt to rescue the defendant by others;

(9) size and mood of the audience;

(10) physical security of the courtroom, including the number of entrances and exits, the number of guards necessary to provide security, and the adequacy and availability of alternative security arrangements.

After allowing the defendant to be heard and after making specific findings, the trial judge shall balance these findings and impose the use of a restraint only

where the need for restraint outweighs the defendant's right to be free from restraint." *Id.*

A stun device is considered to be a "restraint" within the meaning of Rule 430. See *People v. Allen*, 222 Ill. 2d 340, 347 (2006). Although the court made a finding as to a factor not listed in Rule 430, namely, the visibility and comfort of the stun cuff, the court failed to make specific findings as to the 10 factors in Rule 430. Shafer contends that, by this omission, the court violated his right to due process.

¶ 55 Defendant acknowledges that he omitted the Rule 430 issue in his posttrial motion and that, normally, this omission would result in a procedural forfeiture (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). As defendant points out, however, the supreme court held in *People v. Almond*, 2015 IL 113817, ¶ 54: "[C]onstitutional issues that were previously raised at trial and could be raised later in a postconviction petition are *not* subject to forfeiture on direct appeal under *Enoch*." (Emphasis in original.)

¶ 56 To Shafer's invocation of *Almond*, the State has a twofold response.

¶ 57 First, the State disputes that a violation of Rule 430 is a constitutional violation. That proposition cannot be reasonably disputed. The case law is overwhelming that a violation of Rule 430 is a violation of due process. See *People v. Reese*, 2017 IL 120011, ¶ 49; *In re Benny M.*, 2017 IL 120133, ¶ 29; *Allen*, 222 Ill. 2d at 349; *People v. Bell*, 2020 IL App (4th) 170804, ¶ 125; *People v. Gone*, 375 Ill. App. 3d 386, 392 (2007).

¶ 58 Second, the State notes that, in *People v. Cosby*, 231 Ill. 2d 262, 273 (2008), the supreme court held that the appellate court had erred by disregarding the forfeiture of an argument merely on the ground that the argument was constitutional. The supreme court said in *Cosby*: "[T]he mere fact that an alleged error affects a constitutional right does not provide a separate

ground for review, for even constitutional errors can be forfeited." (Internal quotation marks omitted.) *Id.* at 272-73. Five years after *Cosby*, however, the supreme court decided it made no sense to bar, from a direct appeal, a constitutional claim that was omitted from the posttrial motion, considering that the only effect would be to put off the claim to a postconviction proceeding. *People v. Cregan*, 2014 IL 113600, ¶ 18. "[T]he interests in judicial economy favor addressing the issue on direct appeal rather than requiring [the] defendant to raise it in a separate postconviction petition." *Id.* More recently, in *Almond*, 2015 IL 113817, ¶ 54, the supreme court appeared to require partial compliance with *Enoch*, namely the making of a contemporaneous objection:

> "[W]hen *** a defendant fails to raise a constitutional issue in a posttrial motion *but the issue was raised at trial* and could be raised in a postconviction petition[,] the interests in judicial economy favor addressing the issue on direct appeal rather than requiring [the] defendant to raise it in a separate postconviction petition." (Emphasis added and internal quotation marks omitted.)

¶ 59    Why judicial economy would not favor the same policy in the absence of a contemporaneous objection is unclear, but *Almond* says what it says: addressing the issue on direct appeal is conditional on whether the issue was raised at trial. *Id.* The State contends that, instead of raising the Rule 430 issue in the proceedings below, Shafer affirmatively assented to the stun cuff and thereby waived the Rule 430 issue. See *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 75 (explaining that a procedural forfeiture is "a failure to make a timely assertion of a right" whereas a waiver is the "intentional relinquishment of a known right" (internal quotation marks omitted)); see also *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 800 (2009) (holding that the doctrines of invited error, waiver, and judicial estoppel forbid a party to affirmatively take one position in the circuit court and then take a contrary position on appeal). Shafer told the circuit

court that the stun cuff "[s]hould be fine." That is true as far as it goes. But then the circuit court turned to defense counsel and said, "So, Mr. Ortega, I will let you further address the issue if you'd like to." Defense counsel responded: "My biggest concern is just when we are entering the courtroom; but just show our continuing objection, Judge." Because Shafer was represented, defense counsel's response was the response that counted. There is no such thing as simultaneous self-representation and representation by counsel (*People v. Stevenson*, 2011 IL App (1st) 093413, ¶ 30), defense counsel spoke for Shafer, and we give effect to defense counsel's objection. "[T]he issue" of stun cuff or no stun cuff "was raised at trial." *Almond*, 2015 IL 113817, ¶ 54.

¶ 60        Usually, a contemporaneous objection is insufficient to preserve an issue for review—the issue also has to be raised in the posttrial motion (*Enoch*, 122 Ill. 2d at 186)—but since the Rule 430 issue is constitutional and would only be put off to a postconviction proceeding, a contemporaneous objection is sufficient under *Almond*. *Id.* Consequently, there is no forfeiture of the Rule 430 issue. Because the purpose of the plain-error doctrine is to decide whether to "by-pass normal rules of forfeiture" (*People v. Eppinger*, 2013 IL 114121, ¶ 18) and because, under *Almond*, Shafer's due-process claim "is *not* subject to forfeiture on direct appeal" (emphasis in original) (*Almond*, 2015 IL 113817, ¶ 54), we need not take up the parties' arguments and counterarguments on the plain-error doctrine. Instead, we proceed straight to the question of whether the due-process violation was harmless beyond a reasonable doubt. See *Reese*, 2017 IL 120011, ¶ 50.

¶ 61        The appellate court has explained:

"Three approaches have been used for determining whether an error is harmless beyond a reasonable doubt: (1) focusing on the error to determine whether it may have contributed to the conviction; (2) examining the other evidence in the case to

- 24 -

see if overwhelming evidence supports the conviction; and (3) considering whether the evidence is cumulative or duplicates properly admitted evidence." *People v. Bass*, 2019 IL App (1st) 160640, ¶ 81.

The third approach is inapplicable because this is not a case in which inadmissible evidence was admitted. The first two approaches militate in favor of a finding that the use of the stun cuff was harmless beyond a reasonable doubt. The judge came down from the bench and looked to see whether the stun cuff was visible while Shafer was in a sitting position. Apparently, it was not. Therefore, it seems unlikely it would have been visible as he was walking in the courtroom. The stun cuff caused him no discomfort: he told the judge it "should be fine." We do not see how the stun cuff, concealed from the jury, could have contributed to the guilty verdicts. And, in any event, the evidence against Shafer was overwhelming. It was undisputed that he fired the pistol at the door after hearing someone knock. He testified that he fired the pistol with the intent to kill the men whom he perceived as menacing him. Granted, Shafer testified that he had heard a pistol shot outside. But there was a knock at the door before Shafer fired. A knock signified a request for permission to enter. If someone was knocking at the door, as opposed to, say, trying to break it down, Shafer could not "reasonably believe" that the use of deadly force against the person seeking admission was, at that moment, "necessary to prevent imminent death or great bodily harm to himself or another." 720 ILCS 5/7-1(a) (West 2016). The evidence against Shafer appears to be compelling. We conclude, then, on the basis of the two considerations in *Bass*, that the violation of Rule 430 was harmless beyond a reasonable doubt.

¶ 62                                    III. CONCLUSION

¶ 63          For the foregoing reasons, we reverse the conviction of felony murder, affirm the remaining convictions, and remand this case for resentencing.

¶ 64        Affirmed in part, reversed in part, and remanded.

No. 4-18-0343

| | |
|---|---|
| **Cite as:** | *People v. Shafer*, 2020 IL App (4th) 180343 |
| **Decision Under Review:** | Appeal from the Circuit Court of Coles County, No. 16-CF-239; the Hon. Brien J. O'Brien, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Ryan R. Wilson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Jesse Danley, State's Attorney, of Charleston (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |